800 So.2d 762 (2001)
BELLE PASS TERMINAL, INC. and Harold J. Callais
v.
JOLIN, INC. and Joseph E. Blanchard, Jr.
Jolin, Inc.
v.
Belle Pass Terminal, Inc., Richard P. Guidry, Individually, Elmo J. Pitre, Jr., Individually and Harold J. Callais, Individually.
No. 2001-C-0149.
Supreme Court of Louisiana.
October 16, 2001.
Opinion on Grant of Rehearing December 7, 2001.
*764 Alvin Bordelon, Jr., L.G. LaPlante, Jr., Regina C.S. Wedig, Bordelon, Hamlin & Theriot, New Orleans, Counsel for Applicant.
Jerald P. Block, Matthew F. Block, Kimberly A. Theriot, New Orleans, Counsel for Respondent.
TRAYLOR, J.[*]
We granted certiorari in this case to consider whether the court of appeal erred in affirming the trial court's ruling dismissing plaintiff's motion to annul a judgment rendered in 1992. For the reasons assigned, we reverse the judgment of the Court of Appeal, First Circuit, and remand the matter to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Richard Guidry, maintains the judgment rendered against him was the result of fraud or ill practices by defendant, Joseph Blanchard. Since the basis of Guidry's nullity action concerns actions taken by a co-defendant in the initial suit, it is beneficial to have a complete overview of the underlying litigation.
The original Belle Pass litigation arose from the sale of a marine terminal and docking facility at Pass Fourchon in La-Fourche, Louisiana. In 1988, Joe Blanchard (Blanchard), attempted to negotiate a sale of his marine dock and terminal business, known as Fourchon Docks on Pass Fourchon, with Milpark Drilling Fluids, Inc. The land on which the dock was located was leased to Jolin, Inc. (Jolin), a closely held corporation owned by Blanchard, by Caillouet Land Company (CLC) pursuant to a long-term lease. Blanchard's company, Jolin, owned the facility and leased the land used for the facility from CLC. By the express terms of the lease, Blanchard/Jolin could not sell, assign, or transfer the lease without CLC's consent. After the deal with Milpark Drilling fell through, Blanchard approached Elmo Pitre, Jr. (Pitre), a local business man, regarding purchasing the facility. As Pitre was unable to secure financing on his own, he attempted to put together a group of investors comprised of himself and two other investors, Harold Callais (Callais) and Richard Guidry (Guidry). The company created for the purpose of purchasing the docks was named Belle Pass Terminal, Inc. (Belle Pass).
On April 6, 1989, two separate transactions occurred with the gentlemen of Belle Pass and Blanchard. The first transaction was a cash sale of all equipment, cranes, and forklifts and other stock used in the business to Callais for the sum of $1,000,000.00 cash. The second transaction was the sale and mortgage agreement in which Blanchard and his company, Jolin, sold the docking facility to Belle Pass for the sum of $2,000,000.00 represented by a note, to be paid over a ten year period. Guidry, as president of Belle Pass, signed the note and Guidry and Pitre personally guaranteed the note; however, Callais did not guarantee the $2 million note.
After the sale, the Belle Pass business struggled and the relationships between the parties became strained. Pitre, who was working as the manager of the dock, was terminated by Guidry and Callais following Pitre's indictment on felony counts in federal court, and Pitre filed a lawsuit against Guidry and Callais over his termination. Blanchard also became upset *765 with Guidry and Callais over Pitre's dismissal from Belle Pass. Following Pitre's termination, the parties encountered difficulties involving the required insurance coverage and timeliness of the scheduled payments to Blanchard. Thereafter, Blanchard and Jolin filed a lawsuit on the promissory note against Belle Pass, Guidry, Pitre, and Callais.
The Belle Pass matter was tried before a jury in early 1992. The critical issue presented to the jury concerned whether John's lease of the CLC land had been sold to Belle Pass. The jury determined that Jolin and Blanchard had not sold the lease issued by CLC to Belle Pass, Guidry, and Pitre. As a result of this determination, judgment was rendered in the action on the promissory note in favor of Jolin and Blanchard and against Belle Pass, Guidry, and Pitre for $2 million plus interest.
As a result of the verdict and judgment, Belle Pass declared bankruptcy. In the bankruptcy proceeding, Blanchard foreclosed on his mortgage and succeeded in reclaiming the terminal facility. Blanchard then began executing his judgment against Guidry, but made no effort to execute against Pitre until May 7, 1995. However, Blanchard was unable to execute the judgment against Pitre because Pitre had also declared bankruptcy.
The proliferation of litigation spawned by the 1989 Belle Pass transaction continued on September 18, 1995, when Rodney J. Martin filed a suit for breach of contract against Blanchard, Blanchard's wife, Linda, and Elmo Pitre, III, d/b/a R & J Trucking Company. Martin alleged the defendants were jointly and solidarily liable to him for the principal sum of $34,096.88, and also sought to recover lost profits and damages allegedly resulting from the defendant's alleged breach of contract.
The testimony in Martin's case revealed that in early 1991, Pitre approached Rodney Martin with a scheme he claimed would be very profitable for himself and Martin. Pitre explained that Blanchard was engaged in litigation arising from the sale of the terminal facility at Port Fourchon to Belle Pass and that Blanchard needed help in paying his legal fees. According to Martin, Blanchard and Pitre were seeking to obtain a judgment against Callais and Guidry for the $2 million note. Martin claimed his role was to provide funds to Blanchard on his legal expenses, and, in exchange, he would be considered an equal partner when Blanchard and Pitre returned to business in Fourchon at the old John facility. Martin subsequently took out loans on his home in order to provide money to Blanchard for his legal fees. According to Martin, his arrangements with Blanchard and Pitre were to be kept secret from Callais and Guidry. Martin was never repaid for his loans made to Blanchard for his legal expenses.
When Guidry became aware of the alliance between Blanchard and Pitre, he filed a suit on November 15, 1995, pursuant to La.Code Civ. P. art. 2004. Guidry sought to annul the 1992 judgment in the Belle Pass litigation which was originally rendered on March 2, 1992. Guidry contended that he knew nothing of the pact between Blanchard and Pitre until Martin's suit was filed in September, 1995.
After a trial on Guidry's motion to annul, the trial court denied Guidry's petition seeking annulment of the 1992 judgment. The trial court found that although Pitre was not completely forthcoming in his testimony, sufficient evidence presented at the original trial should have led the jury to believe that Pitre was not completely aligned with Guidry and Callais. The court of appeal affirmed the trial court, finding Guidry was not deprived of his *766 legal rights, and pretermitted the issue of whether the enforcement of the judgment would be inequitable and unconscionable.
We granted writs to consider the correctness of these rulings. Belle Pass Terminal, Inc. v. Jolin, 01-0149 (La.4/20/01), 790 So.2d 7.

DISCUSSION
According to La.Code Civ. P. art. 2004, any final judgment obtained by fraud or ill practices may be annulled. However, the article is not limited to cases of actual fraud or intentional wrongdoing, but is sufficiently broad to encompass all situations wherein a judgment is rendered through some improper practice or procedure. Kem Search v. Sheffield, 434 So.2d 1067 (La.1983). It is imperative that courts review a petition for nullity closely as an action for nullity based on fraud or ill practices is not intended as a substitute for an appeal or as a second chance to prove a claim that was previously denied for failure of proof. The purpose of an action for nullity is to prevent injustice which cannot be corrected through new trials and appeals. Gladstone v. American Auto. Ass'n, Inc., 419 So.2d 1219, 1222 (La.1982), citing Project of Louisiana Code of Practice of 1825 at 97 (Official Reprint, 1938). Clearly, the delays for asserting a motion for new trial as well as the appeal delays have long since expired for Guidry.
The trial court denied Guidry's motion to annul the original judgment, finding the jury "probably" would not have reached a different verdict if it had known the true relationship between Pitre and Blanchard. Guidry disagrees. He argues that the original Belle Pass judgment was rendered as a result of fraud or ill practices. Guidry's contention is that, had the jury in the 1992 Belle Pass trial known of the relationship that existed between Blanchard and Pitre, and if it had known that Pitre was directing Martin to provide funds to Blanchard for his legal expenses, the jury would have rejected the Blanchard/Pitre version of the 1989 transaction. At the hearing on the annulment, Guidry produced testimony from Martin and Pitre himself to support his allegations. All of Guidry's evidence was aimed at proving that the jury should have been aware of the agreement between Blanchard and Pitre and to show that Pitre had "nothing to lose" in the Belle Pass litigation.
In reviewing a decision of the trial court on a petition for nullity, the issue for the reviewing court is not whether the trial court was right or wrong but whether the trial court's conclusions were reasonable. Kem Search at 1071. Accordingly, we must consider whether the ruling of the trial court, denying Guidry's motion to annul the 1992 judgement, was reasonable.
Louisiana jurisprudence sets forth two criteria to determine whether a judgment has been rendered through fraud or ill practices, and is thus subject to nullification: (1) whether circumstances under which the judgment was rendered showed the deprivation of legal rights of the litigant seeking relief; and (2) whether enforcement of the judgment would be unconscionable or inequitable. Johnson v. Jones-Journet, 320 So.2d 533 (La.1975), Smith v. Cajun Insulation, Inc. 392 So.2d 398 (La.1980), and Ward v. Pennington, 523 So.2d 1286 (La.1988).
First, we must determine whether the circumstances under which the judgment was rendered show a deprivation of Guidry's legal rights. In its opinion, the court of appeal stated that a legal right has been defined as "the opportunity to appear and assert a defense." Belle Pass Terminal v. Jolin, 99-2988 (La.App. 1 Cir. 12/22/00), 774 So.2d 1251, 1254, citing Johnson at 537. We find the court of *767 appeal's interpretation of what constitutes a legal right is too narrowly tailored, thus addressing only those instances where the litigant fails to appear in court or assert a defense. Furthermore, the definition used by the court of appeal fails to consider circumstances where the litigant appears in court but is prevented from participating in a fair and impartial proceeding due to ill practices of another party. Surely, an individual may receive notice of trial, retain counsel and appear in his own defense; but if material realignment is deliberately kept hidden from the individual, his exercise of his right to appeal and defend are rendered worthless. Article I, Section 22 of the Louisiana Constitution provides that "all courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person property, reputation, or other right." La. Const. Art. I, Section 22. While a civil defendant is not constitutionally entitled to a trial, once a trial commences, it is a basic precept that the proceedings must be fair. Hence, we find that a right to a fair and impartial trial is a legal right entitled to all participants in a legal proceeding.
In the instant case, Guidry was deprived of his legal right to a fair and impartial trial due to the collusion between Blanchard and Pitre. The evidence presented at the annulment hearing established that Pitre made several material misrepresentations to the court during the original trial. In Spence v. Spence, 158 La. 961, 105 So. 28 (1925), this court, in interpreting Article 607 of the Code of Practice (the source of Article 2004), stated that "perjury is not a ground for vacating the judgment where the judgment does not rest upon the perjured testimony, as where it relates to an immaterial matter." Spence 105 So. at 30. Although the Spence decision did not turn on the quoted language, a logical interpretation of Article 2004 dictates that a judgment will not be annulled on account of fraud or ill practice in the course of a legal proceeding if the fraud or ill practice pertained to a matter irrelevant to the basis of the decision and the judgment therefore was not obtained by fraud or ill practice. Ward v. Pennington, 523 So.2d 1286 (La.1988).
After evaluating the misrepresentations made by Pitre in the original trial, we find the statements made by Pitre were material to the issue presented to the jury. In the original Belle Pass proceeding the jury interrogatories asked the jury to consider the issue of whether Blanchard sold the lease to Belle Pass Terminal, Inc., Richard Guidry and Elmo Pitre, Jr. on April 6, 1989. Several witnesses testified at the original trial, including Blanchard, Guidry, Callais and Pitre. During his testimony in the original trial, Pitre was questioned not only to the intent of the parties at the time of confecting the agreement but he was also questioned regarding his relationship with Blanchard. Pitre testified that Blanchard never intended to sell the lease to Belle Pass and denied having any relationship with Blanchard. On the critical issue of whether there had been a sale of lease, Pitre testified:
Q: Now, was there a discussion at that time about whether or not Belle Pass, Inc. or the group, Callais, Guidry and Pitre, would buy the leases from Jolin?
A: The deal was simple. Harold Callais was to buy the equipment for a million dollars. He would turn around and sell that equipment to the corporation ... The leases were never to be transferred or sold at that time. Never, never.
*768 Conversely, Guidry maintained that Blanchard did sell the lease to Belle Pass. Pitre was also asked whether he met with Blanchard and his attorney to prepare his testimony. Pitre admitted to meeting with Blanchard and his attorney, but claimed that he only met with the two men to review his deposition.[1] He emphatically testified that his testimony was truthful. Furthermore, Pitre was questioned regarding statements made which suggested that he would be in business with Blanchard at the conclusion of the trial as well as assurances that there was no need for anyone to worry about Blanchard's stake in the case. Pitre denied making any such statements and denied that he had any type of business relationship with Blanchard.
By contrast, at the annulment hearing, Martin testified that Pitre was in business with Blanchard and that Pitre did have a financial stake in the outcome of the case. In fact, Martin stated that Pitre was paying Blanchard's legal fees and assured him that he would be a one-third owner in the business with Blanchard and himself. Clearly, Martin and Guidry's testimony is in direct conflict with Pitre's testimony.
The trial judge, in his reasons for judgment, determined that there was sufficient evidence presented at the trial to show that Pitre was aligned with Blanchard. However, the evidence presented by Guidry raises serious doubt as to the reasonableness of the trial judge's finding. The agreement between Pitre and Blanchard in effect threatened Guidry's right to a fair trial for two reasons. First, Pitre had an incentive to perjure himself, since he had a financial interest in Blanchard's recovery. Second, Pitre's testimony skewed the presentation of the case to the jury. Jurors are traditionally unfamiliar with court proceedings, they come to court expecting to see a contest between the plaintiff and the defendants, but instead see one of the defendants cooperating with the plaintiff. Such cooperation was certainly detrimental to Guidry. The farce presented by Pitre and Blanchard serves to distort the judicial process. Pitre who was a culpable defendant, made a "good deal" with Blanchard and ended up paying nothing towards the liability. Clearly, this is not behavior which should be sanctioned by the courts.
The agreement between Pitre and Blanchard undoubtably thwarted the fairness of the proceeding since the jury could not fairly weigh Pitre's self-serving testimony. Based on the evidence presented at the hearing, we find Guidry was deprived of his legal right to a fair and impartial trial due to the material misrepresentations made by Pitre.
Having determined that Guidry was deprived of a legal right, we must now decide whether the enforcement of the judgment would be unconscionable and inequitable. As a result of the original verdict, Belle Pass was forced into bankruptcy; Blanchard reacquired the terminal; and Blanchard began to execute on the two (2) million dollar note against only Guidry. It is indisputable that Guidry has suffered a great loss from the actions of Pitre and Blanchard. However, what truly is unconscionable is the disrespect the parties have shown for the judicial system. As stated above, numerous instances were cited by Guidry and confirmed by Martin and/or Pitre himself, to establish that there were serious misrepresentations made to the jury. It is imperative that courts not sanction the agreements between parties which prevent courts from knowing facts necessary to make a fair and impartial determination. It is every *769 court's duty to protect the integrity of the judicial system; therefore, this behavior cannot be tolerated. Thus, we find that the enforcement of the 1992 judgment would be unconscionable and inequitable.

CONCLUSION
There are persuasive considerations against disturbing the integrity of the final judgments obtained without artifice. Johnson, 320 So.2d at 537. However, when judgments are obtained with fraud or ill practices, courts are obliged to strike down those judgments. The case presented to this court presented egregious facts and the parties whose actions resulted in the original judgment should not prosper from their ill practices. Accordingly, we find the court of appeal erred in affirming the trial court's ruling. The matter is remanded to the trial court for further proceedings.

DECREE
For the reasons assigned, the judgment of the lower courts are reversed. The matter is remanded to the trial court for further proceedings.
REVERSED.

ON REHEARING
PER CURIAM.[*]
We granted rehearing for the sole purpose of addressing defendants', Jolin, Inc. and Joseph Blanchard, exception of prescription. For the reasons stated below, we decline to grant defendants' exception of prescription.
On July 11, 2001, defendants' filed an exception of prescription in this court urging that plaintiffs' claim for nullity of the trial court's judgment in its favor prescribed. According to defendants, plaintiffs were well aware or at least should have been aware of Pitre's alliance with Blanchard. Defendants also aver that it was apparent from the testimony presented at the original trial that Pitre was not completely aligned with his co-defendants.
Prescription runs against all persons unless an exception is established by legislation. La. Civ.Code art. 3467. Contra non valentem is a judicially created exception to the general rule of prescription and is based on the civilian doctrine of contra non valentem agere nulla currit praescripto. The doctrine applies in four general situations:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action;
(2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action;
(4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.

Whitnell v. Menville, 540 So.2d 304, 308 (La.1989).
Thus, prescription did not run against Guidry, who was ignorant of facts upon which his cause of action was based, as long as such ignorance was not willful, negligent or unreasonable. White v. West Carroll Hospital, Inc. 613 So.2d 150 (La.1992).
*770 On November 15, 1995, two months after Rodney Martin filed his lawsuit against Blanchard and Pitre, Guidry filed a motion to annul the original Belle Pass judgment. Guidry's petition was based on the allegations contained within Martin's petition. The testimony in Martin's case revealed that in early 1991, Pitre approached Martin with a scheme he claimed would be very profitable for himself and Martin. Martin specifically testified that Blanchard and Pitre were seeking to obtain a judgment against Callais and Guidry for the $2 million note. According to Martin, his arrangements with Blanchard and Pitre were to be kept secret from Callais and Guidry. Throughout these proceedings, Guidry maintains that he was not aware of the "true" nature of the relationship between Pitre and Blanchard. He submits that it was not until Martin's lawsuit was filed that he learned of the scheme. This court agrees with Guidry that he could not have substantiated a petition for nullity based on ill practices nor could he have known the extent of Pitre's ill practices without Martin's information. Thus, prescription did not begin to run until the necessary facts were made available to Guidry.
Blanchard and Pitre intentionally concealed their agreement from the courts and the parties. Moreover, since Guidry's failure to uncover the facts upon which his petition for nullity was based was not willful, negligent or unreasonable, we find no merit to defendant's exception of prescription. In all other respects, the application for rehearing is denied.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Associate Justice Pro Tempore, participating in the decision.
[1] Post-trial Pitre admitted that he and Blanchard rehearsed his testimony.
[*] Retired Judge Robert L. Lobrano, assigned as Associate Justice Pro Tempore, participating in the decision.