951 So.2d 1058 (2007)
Betty Jo H. WRIGHT, et al.
v.
LOUISIANA POWER & LIGHT, et al.
No. 2006-C-1181.
Supreme Court of Louisiana.
March 9, 2007.
*1060 Thomas Moore Hayes, III, Monroe, McGlinchey Stafford, Colvin Gamble Norwood, Jr., New Orleans, for Applicant.
Leger & Mestayer, Michael John Mestayer, Walter J. Leger, Jr., New Orleans, Davenport, Files & Kelly, Michael J. Fontenot, Monroe, for Respondent.
VICTORY, J.
We granted a writ application in this nullity action to determine whether the court of appeal erred in reversing the trial court's rulings granting exceptions of no cause of action and prescription, and motion for summary judgment in favor of defendant. After reviewing the record and applicable law, we find that court erred in reversing the trial court's ruling granting the motion for summary judgment and reinstate the trial court's ruling.

FACTS AND PROCEDURAL HISTORY
On the afternoon of October 16, 1988, Ned Wright drove his 1982 Mercedes-Benz SL open-topped convertible up a guy wire anchoring a light pole in Monroe, Louisiana, causing the car to overturn. Mr. Wright, who was unbelted, was partially ejected and died minutes after the accident. His wife, Betty Jo Wright, who was sitting in the passenger seat, survived. Tests taken at the hospital showed Mr. Wright had a blood alcohol level of 0.19 at the time of the accident. There is no dispute that Mr. Wright was solely at fault in causing the accident.
In November of 1988, Mrs. Wright, through her attorneys, sold the 1982 Mercedes to Steven Taylor for $11,455 in Monroe. Taylor repaired and replaced all of the Mercedes's damaged parts, including the windshield frame, i.e., the A-pillars above the belt line, the left front fender, the headlight assembly, and the left door. All removed parts were sold to Auto Shred and destroyed and no photographs were taken by Taylor of the vehicle in its damaged condition.
*1061 On September 12, 1989, plaintiffs[1] filed suit against Louisiana Power and Light (LP & L)[2], as the owner of the utility pole, and Mercedes-Benz of North America, Inc. (MBNA).[3] Plaintiffs alleged that the open-topped convertible was defectively designed because it lacked adequate "rollover protection" that would have prevented Mr. Wright's death. Specifically, plaintiffs faulted the convertible's design because it (1) lacked a rollover bar and (2) lacked stronger A-pillars.[4] On October 23, 1989, plaintiffs propounded a request for production of documents to MBNA, requesting the following: "Request for Production No. 20: Any and all tangible evidence retrieved from the accident site involved herein or taken from the vehicle in question following the death of Ned. D. Wright." On December 8, 1989, MBNA responded to the request as follows: "Response to Request for Production No. 20: Defendant, MBNA, has no such evidence." There is no dispute that this response was truthful and correct at the time it was made.
MBNA propounded a Request for Production on plaintiffs, seeking the production of the vehicle or any parts of the vehicle. Plaintiffs responded that "Plaintiff does not own or control the vehicle in question and cannot produce same" and "Plaintiff does not have any component parts of the vehicle in question in her possession."
In February of 1990, Taylor sold the repaired vehicle in Dallas, Texas to the Dallas Auto Mart. On January 1, 1992, Defendants filed a spoliation motion alleging that plaintiffs spoliated evidence by selling the vehicle to a person who would undoubtedly replace all of the Mercedes' damaged parts, particularly the A-pillars which were alleged to be defective. Defendants claimed that the failure of plaintiffs to preserve the evidence which they knew would be involved in litigation prejudiced their ability to prepare a defense and sought the following relief: (1) dismissal of *1062 all plaintiffs' claims regarding the vehicle; or (2) refusal to allow any evidence to be presented regarding alleged defects in the vehicle. Plaintiffs responded to the spoliation motion that the vehicle was sold without any attempt to hide or destroy evidence or to gain any unfair advantage, and that defendants had waited nearly two years from the date of the accident to request information concerning the whereabouts of the vehicle and "had they acted more promptly, knowing full well the significance of their delay, they may have had an opportunity to examine the car before repairs were made." The trial court denied the motion.
After the enrollment of new and additional counsel, on July 31, 1998, defendants filed a Motion for Partial Summary Judgment and/or Motion to Partially Dismiss based on Spoliation and/or Motion in Limine to Exclude Claims Concerning the Alleged Defects in the A-pillar. This motion was supplemented on or about November 30, 1998, and defendants filed a reply brief on August 13, 1999. The motion claimed that they were unable to present a defense to the defective A-pillars claim because plaintiffs had allowed the A-pillars to be destroyed. Plaintiffs defended this motion on the same grounds it defended the first spoliation motion. While this motion was pending, defendant's new counsel, Timothy Smith, hired an investigator to find the vehicle in question. The investigator found the vehicle by conducting a Department of Motor Vehicles search and traced it to Texas. On November 23, 1998, defendants filed into the record a "Supplemental Exhibit List," which specifically listed as an exhibit: "1. Registration Certificate from Texas showing that Ned Wright's vehicle was sold to Mr. Hudson."[5] On March 1, 1999, Mr. Smith purchased the vehicle on behalf of defendants from its then owner, Meredith Misenhelter, and after examination confirmed that the A-pillars had been removed. Title to the vehicle was put into Mr. Smith's name. Defendants did not inform plaintiffs or the court that they had purchased and had possession of the vehicle. On August 23, 1999, the spoliation motion regarding the A-pillars was argued and denied by the trial court.
On August 13, 1999, defendants filed a Motion to Limit Dr. Limpert's [plaintiffs' expert] Testimony to Design Defect Theories Regarding the Lack of Additional Spot welds on A-pillars and Lack of a Fixed Roll Bar. As part of their argument, defendants argued that Dr. Limpert had admitted that he never saw Mr. Wright's vehicle. The trial court denied defendant's motion in limine, allowing Dr. Limpert to testify as an expert. On March 3, 2000, the Second Circuit denied defendants' writ application, ruling as follows:
The trial court correctly decided that Dr. Limpert's testimony has a sufficiently reliable basis for admissibility under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and State v. Foret, 628 So.2d 1116 (La.1993). Dr. Limpert testified extensively that the structures and forces involved in an auto crash of this type are simple and, given the witness' expertise in engineering, readily capable of explanation. Moreover, Dr. Limpert has access to the blueprints of the A-pillar design in question and to DBAG's [Daimler Benz Aktiengesellschaft] own A-pillar test results.
Trial on the merits occurred from April 3-19, 2000. On April 19, 2000, the trial *1063 court granted Directed Verdict in favor of MBNA because it was a "non-manufacturing seller." The jury found in favor of all defendants. Plaintiffs' motion for new trial was denied and in March of 2001 the case was settled regarding a cost award assessed against plaintiffs and plaintiffs' appeal was dismissed with prejudice.
On December 10, 2003, plaintiffs filed a Petition for Damages and for Equitable Remedy Nullifying Judgment and Ordering New Trial Based upon Fraud or Ill Practices and Spoliation of Evidence, naming as defendants the original defendants to the Wright lawsuit, and also the law firms representing those defendants.[6] The Petition alleged as follows:
VIII.
The plaintiffs' causes of action in the prior litigation were based upon product liability claims related to alleged defects in design, defects in material or composition, and defects as a result of failure to warn.
IX.
During the course of the litigation, plaintiffs requested that the defendants produce any tangible evidence from the accident site and this request included the vehicle in question.
X.
The defendants initially responded to the requested production of the vehicle in question in an apparent truthful manner, but subsequently their counsel located and purchased the vehicle in his individual name.
XI.
After purchasing the vehicle, defense counsel for defendant did not inform the plaintiffs or the Court that they had physical possession of the vehicle, and filed numerous pleadings suggesting just the opposite.
XII.
While having possession of the vehicle in question, defendants sought to have the plaintiffs' claims dismissed on the basis of spoliation, on the basis of failure to demonstrate defects in design, construction or composition, or in failure to warn, and on the basis that the plaintiffs' experts who had not examined the case were incompetent to testify as experts.
XIII.
Defendants had an affirmative obligation under Article 1428 of the Code of Civil Procedure to disclose the possession and ownership of the vehicle and failed to do so.
XIV.
Defendants had an affirmative obligation to the Court to disclose that their attacks on the plaintiffs' legal position and on the plaintiffs' experts were inaccurate because the defendants had actual possession of the vehicle.
XV.
The failure to disclose of this "crown jewel of product liability litigation" to opposing counsel or to the Court constituted a fraud or ill practice as defined *1064 by Article 2004 of the Louisiana Code of Civil Procedure and constituted conscious spoliation of evidence by secreting and later destroying the vehicle at issue.
XVI.
The plaintiffs first learned of the possibility of the above recited fraud or ill practice less than one year from the date of the filing of this Petition.
XVII.
As a result of the intentional hiding of critical evidence, plaintiffs were prevented from presenting critical evidence to the Court and the jury, all of which resulted in the lost opportunity to present factual evidence to a trier of fact to obtain just compensation for the damages sustained by the plaintiffs in the accident of 16 October 1988.
XVIII.
Defendants' conscious decision to secret and destroy the critical evidence in the former litigation constituted a fraud or ill practice, negligent spoliation of evidence, intentional spoliation of evidence, and/or fraud upon the court, thereby entitling the plaintiffs to recover all damages related to the former litigation.
XIX.
The defendants acted in concert and with full knowledge of the deceit upon the Court and opposing counsel and should, therefore, be solidarily cast in judgment for the entirety of all damages sustained.
On April 23, 2004, plaintiffs propounded discovery requests to defendants seeking, among other things, information concerning any inspection of the vehicle done by defendants after defendants acquired the vehicle. On May 5, 2004, defendants filed a Motion for Protective Order, seeking to stay all discovery until 30 days after the court had determined which division the matter would proceed, see footnote 6, supra, and "the proper division has resolved MBUSA's exceptions demonstrating that plaintiffs state no cause of action as a matter of law." The trial court granted the protective order.
On November 2, 2004 MBUSA filed exceptions and an alternative Motion for Summary Judgment in response to plaintiffs' Petition to nullify the judgment. MBUSA claimed, among other things, that:
1. Plaintiffs cannot plead facts demonstrating that the defendants owed them any duty to disclose information regarding Ned Wright's 1982 Mercedes-Benz 380 SL convertible (the "Subject Vehicle");
2. Plaintiffs cannot meet the requirement of "diligence" under Article 2004 because they failed to exhaust obvious possibilities for finding the Subject Vehicle, including:
(a) procuring the vehicle after the litigation started, but while it was still in Monroe, for most if not all of that time in the possession of the very person to whom plaintiffs had sold the vehicle;
(b) searching the public records through easily available sources by using the Vehicle Identification Number ("VIN") that is unique to the Subject Vehicle; or
(c) propounding discovery to defendants specifically requesting production of the vehicle or information about its current location.
3. Plaintiffs cannot demonstrate that their knowledge of the location of the Subject Vehicle at the time of trial would have changed the outcome of the jury's verdict, because in the original proceeding, plaintiffs themselves argued *1065 that the vehicle was irrelevant to their claim; and
4. Plaintiffs' claims are all prescribed by the applicable statute of limitations because, under plaintiffs' own (current) theory, they now suggest that they believed the vehicle was a "critical piece of evidence" all along, yet they knew that it was missing. Thus, they clearly had the requisite level of notice  i.e., inquiry notice  to look for the vehicle by searching public records and/or propounding specific discovery.
The defendant attorneys, Carrol, Burdick & McDonough LLP and Bernard, Cassisa, Elliott & Davis, joined in each exception and argument of MBUSA, and additionally argued that attorneys owe no duty of disclosure to the opposing party.
After hearing argument on the exceptions and the motion for summary judgment on May 23, 2005, Judge Sharp issued an Expedited Out of Court Judgment on June 23, 2005, in favor of defendants as follows: "For the reasons previously handed down in writing by this Court on or about 22 June 2005; IT IS THE JUDGMENT OF THIS COURT that Defendant's exception of no cause of action is SUSTAINED. Defendant's motion for summary judgment is SUSTAINED. Defendant's exception of prescription is SUSTAINED. Plaintiff's case is DISMISSED with prejudice." In its Reasons for Judgment, the trial judge described the pending action as a "peremptory exception with alternative requests being made." The court reasoned that plaintiffs did not exercise the degree of diligence required to support a judgment in plaintiff's favor in this action for the following reasons: plaintiffs sold the car themselves before trial and put the subject vehicle "out of their own reach" by doing so; plaintiffs minimized the need for the subject vehicle by relying on the "A-pillar theory" in the manner in which they did; after learning defendants had "traced" the subject vehicle to Texas in 1998, they did little, if anything, to secure the subject vehicle or additional data on its location; plaintiffs did not search for the vehicle in a meaningful way until 2003, three years after the trial; and plaintiffs did not narrowly tailor their discovery request to learn of the subject vehicles whereabouts. The trial judge further found that the defendants had no duty to tell plaintiffs or the court that they had purchased the vehicle in response to Request for Production No. 20 because the car was not "retrieved from the accident site involved" nor "taken from the vehicle in question." Further, defendants told plaintiffs they had tracked the vehicle to Texas in November of 1998. In conclusion, the court granted the exception of no cause of action, finding that the defendants had "carried that burden  and then some."[7] In a footnote, the court added:
For the same and/or similar reasons, this Court finds the absence of any genuine issue as to any material fact and the moving party, in the alternative, is entitled to judgment as a matter of law. Consequently, the Motion for Summary Judgment, too, is Granted. As to the issue of Prescription, this Court notes that claims to annul a judgment must be brought within one year of the discovery *1066 by the party seeking annulment. While Plaintiff asserts in paragraph XVI of their Petition that they "first learned of the possibility of the above recited fraud or ill practice less than one year from the date of the filing of this Petition," the Court notes that more than one year has passed since the judgment was had in the original cause and a "conclusory" statement such as that found in paragraph XVI should not be, under these circumstances, sufficient to overcome a plea of prescription. Consequently, Defendant's Exception of Prescription is, likewise, Sustained.
A five-judge panel of the court of appeal reversed. Wright v. Louisiana Power & Light, 40, 636, 40,637 (2 Cir. 4/19/06), 927 So.2d 1275. The court of appeal found that the trial court erred in not giving plaintiffs leave to amend their petition in order to overcome the exception of prescription. Further, the court of appeal reversed the granting of the exception of no cause of action and found that "the other reasons given in granting the exception of no cause of action, i.e., due diligence, no duty to disclose, and that the disclosure would not have changed the outcome, are applicable to the summary judgment motion and not the exception of no cause of action" and that "[c]ertainly, these matters were factually pled and must be accepted as correct in deciding a no cause of action exception." Id. at 1279. Regarding the motion for summary judgment, the court of appeal found as follows:
We find defendants' argument that their answer to the motion to produce was correct and that they had no duty to disclose to be specious. Defendants consciously hid the fact that they had the car. Whether an examination of the car could have benefitted plaintiffs' case is unknown. Clearly, C.C.P. art. 1428(2) imposed a duty on defendants to amend their prior response to discovery requests.
Plaintiffs argue that their accident reconstruction expert, Dr. Rudy Limpert, was criticized by the defense during trial for not producing detailed drawings or tests of the accident sequence, a failure, the expert explained, which resulted from a dearth of "physical evidence" available for his inspection. Plaintiffs further contend, that, had Dr. Limpert had access to the Mercedes, plaintiffs could have effectively negated the testimony of the primary defense expert with respect both to the mechanism and severity of the accident.
Further, plaintiffs list many issues of contested fact about which discovery was sought and denied before the hearing on the motion for a summary judgment. These discovery requests center around the Mercedes while it was in the control of the defendants, such as who examined the vehicle, whether any photographs were taken of the vehicle, the welding quality of the A-pillars, whether any expert conclusions were made after an examination of the vehicle, and other similar questions.
It is clear that there are genuine issues of material fact surrounding the Mercedes while it was in the custody of defendants. It is equally apparent that refusing any discovery prior to the granting of the motion for summary judgment is violative of the directive of La. C.C.P. art. 966 C(1).
Id. We granted defendants' writ application. Wright v. Louisiana Power & Light, 06-1181 (La.10/6/06), 938 So.2d 61.

DISCUSSION
Louisiana Code of Civil Procedure Article 2004 provides:
A final judgment obtained by fraud or ill practices may be annulled.
An action to annul a judgment on these grounds must be brought within one year of the discovery by the plaintiff *1067 in the nullity action of the fraud or ill practices.
Trial courts are permitted discretion in deciding when a judgment should be annulled because of fraud or ill practices, to which discretion reviewing courts will defer. Power Marketing Direct, Inc. v. Foster, 05-2023 (La.9/6/06), 938 So.2d 662, 670; Kem Search, Inc. v. Sheffield, 434 So.2d 1067 (La.1983).
In Johnson v. Jones-Journet, 320 So.2d 533 (La.1975), this Court reviewed the historical development of C.C.P. art. 2004 and noted that the jurisprudence under Art. 607 of the Code of Practice (the source of present C.C.P. art. 2004) established the following criteria for an action in nullity: (1) that the circumstances under which the judgment was rendered showed the deprivation of legal rights of the litigant seeking relief, and (2) that the enforcement of the judgment would have been unconscionable and inequitable.[8] Since that time, this Court has accepted those two requirements as the necessary elements in establishing a nullity action under Art.2004. See Gladstone v. American Auto. Ass'n, Inc., 419 So.2d 1219 (La.1982); Kem Search, supra; Belle Pass Terminal, Inc. v. Jolin, Inc., 01-0149 (La.10/16/01), 800 So.2d 762.
However, those cases also further defined the types of conduct required to establish those two elements depending on the type of fraud or ill practice alleged. This Court has held that "the article is not limited to cases of actual fraud or intentional wrongdoing, but is sufficiently broad to encompass all situations where a judgment is rendered through some improper practice or procedure which operates, even innocently, to deprive the party cast in judgment of some legal right, and where the enforcement of the judgment would be unconscionable and inequitable." Power Marketing, supra at 671; Kem Search, supra at 1070 (citing Chauvin v. Nelkin Ins. Agency, Inc., 345 So.2d 132 (La.App. 1 Cir.), writ denied, 347 So.2d 256 (La. 1977)); see also, Schoen v. Burns, 321 So.2d 908 (La.App. 1 Cir.1975); St. Mary v. St. Mary, 175 So.2d 893 (La.App. 3 Cir.1965); Tapp v. Guaranty Finance Co., 158 So.2d 228 (La.App. 1 Cir.1963), writ denied, 245 La. 640, 160 So.2d 228 (1964).
The Court in Kem Search further defined the required "deprivation of legal rights" as "[c]onduct which prevents an opposing party from having an opportunity to appear or to assert a defense." Id.[9] This definition was further expanded in Belle Pass, which held that "a right to a fair and impartial trial is a legal right entitled to all participants in a legal proceeding."[10] 800 So.2d at 767. The Court *1068 in Belle Pass also explained the purpose of a nullity action as follows:
It is imperative that courts review a petition for nullity closely as an action for nullity based on fraud or ill practices is not intended as a substitute for an appeal or as a second chance to prove a claim that was previously denied for failure of proof. The purpose of an action for nullity is to prevent injustice which cannot be corrected through new trials and appeals.
Id. at 766. Further, the Court held that:
. . . a logical interpretation of Article 2004 dictates that a judgment will not be annulled on account of fraud or ill practice in the course of a legal proceeding if the fraud or ill practice pertained to a matter irrelevant to the basis of the decision and the judgment therefore was not obtained by fraud or ill practice.
Id. at 767.
Regarding nullity actions such as this one where a party alleges the other party withheld information at trial, Gladstone held that "[d]iscovery of evidence which could have been presented at the original trial usually cannot serve as the basis for an action for nullity." 419 So.2d at 1223. As the Court explained:
. . . the mere failure to disclose information at a hearing does not necessarily constitute fraud or ill practice. That determination depends on the nature of the information and the circumstances surrounding the hearing. A party is not obliged to produce evidence favorable to the opponent or to present the opponent's version of the case, and the failure to disclose all information on the issue is not ill practice unless concealment or deceit is involved. Moreover, a party may present only his version of the occurrence, as long as he does not use false or perjured testimony or forged documents.
Id. The Court found that the plaintiff "had every opportunity to support her defenses in the hearing before the appeals referee" and that she "simply did not exercise sufficient diligence in marshaling and presenting evidence of her version of the facts leading up to her termination." Id. In reaching this holding, the Court in Gladstone relied on a nullity case dating back to 1932, which held that "an unsuccessful litigant may not attack a judgment as fraudulent because the other party failed to disclose certain facts within his knowledge, when the plaintiff with reasonable diligence could have ascertained those facts himself." Id. at p. 1223, n. 6 (citing First Nat'l Life Ins. Co. v. Bell, 174 La. 692, 141 So. 379 (1932) (emphasis added)).
With those precepts of Article 2004 in mind, we now turn to the exceptions and motions at issue, which were granted by the trial court. The criteria for deciding an exception of no cause of action are as follows:
A cause of action, when used in the context of the peremptory exception, is defined as the operative facts that give rise to the plaintiff's right to judicially assert the action against the defendant. Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1238 (La.1993). The function of the peremptory exception of no cause of action is to test the legal sufficiency of the petition, which is done by determining whether the law affords a remedy on the facts alleged in the pleading. Id. at 1235. No evidence may be introduced to support or controvert an exception of no cause of action. La. C.C.P. art. 931. Consequently, the court reviews the petition and accepts well-pleaded allegations of fact as true. Jackson v. State ex rel. Dept. of Corrections, 00-2882, p. 3 (La.5/15/01), 785 So.2d 803, 806; Everything on Wheels Subaru, 616 So.2d at 1235. The issue at the trial of the exception is whether, on the face of the *1069 petition, the plaintiff is legally entitled to the relief sought. Montalvo v. Sondes, 93-2813, p. 6 (La.5/23/94), 637 So.2d 127, 131.
Louisiana has chosen a system of fact pleading. La. C.C.P. art. 854 cmt. (a); Montalvo at p. 6, 637 So.2d at 131. Therefore, it is not necessary for a plaintiff to plead the theory of his case in the petition. Kizer v. Lilly, 471 So.2d 716, 719 (La.1985). However, the mere conclusions of the plaintiff unsupported by facts does not set forth a cause of action. Montalvo at p. 6, 637 So.2d at 131.
The burden of demonstrating that the petition states no cause of action is upon the mover. City of New Orleans v. Board of Com'rs of Orleans Levee Dist., 93-0690, p. 28 (La.7/5/94), 640 So.2d 237, 253. In reviewing the judgment of the district court relating to an exception of no cause of action, appellate courts should conduct a de novo review because the exception raises a question of law and the lower court's decision is based solely on the sufficiency of the petition. Fink v. Bryant, 01-0987, p. 4 (La.11/28/01), 801 So.2d 346, 349; City of New Orleans at p. 28, 640 So.2d at 253. The pertinent question is whether, in the light most favorable to plaintiff and with every doubt resolved in plaintiff's behalf, the petition states any valid cause of action for relief. City of New Orleans at p. 29, 640 So.2d at 253.
Ramey v. DeCaire, 03-1299 (La.3/19/04), 869 So.2d 114, 118-19.
Applying that standard to the petition in this case, we find that allegations stated on the face of the petition state a valid cause of action under La. C.C.P. Art. 2004.
Next, we turn to the motion for summary judgment, in which lack of due diligence and defendant's duty to disclose become relevant.[11] This Court has stated the parameters of a motion for summary judgment as follows:
A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.C.C. P. art. 966(B). This article was amended in 1996 to provide that "summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action . . . The procedure is favored and shall be construed to accomplish these ends." La. C.C.P. art. 966(A)(2). In 1997, the legislature enacted La. C.C.P. *1070 art. 966(C)(2), which further clarified the burden of proof in summary judgment proceedings, providing:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
This amendment, which closely parallels the language of Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), first places the burden of producing evidence at the hearing on the motion for summary judgment on the mover (normally the defendant), who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. See MARAIST AND LEMMON, LOUISIANA CIVIL LAW TREATISE: CIVIL PROCEDURE, § 6.8 (1999). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion. Hardy v. Bowie, 98-2821 (La.9/8/99), 744 So.2d 606; Hayes v. Autin, 96-287 (La.App. 3d Cir.12/26/96), 685 So.2d 691, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41.
Babin v. Winn-Dixie Louisiana, Inc., 00-0078 (La.6/30/00), 764 So.3d 37, 39-40. Summary judgments are reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. Power Marketing, supra at 669; Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750.
In this case, lack of due diligence and no duty to disclose are defendants' defenses to the claim that the judgment was obtained by fraud or ill practices, of which defendants would have the burden at trial. Our jurisprudence and common logic dictate that if defendants had no duty to disclose to plaintiffs that they had purchased the car, and, if plaintiffs could have found the car during the 12 years prior to trial using due diligence, then plaintiffs cannot prevail in their attempt to have this judgment annulled under Art. 2004.
We first look to whether, as alleged by plaintiffs in their petition, defendants had a duty to supplement their response to Request for Production No. 20 which asked for "[a]ny and all tangible evidence retrieved from the accident site involved herein or taken from the vehicle in question following the death of Ned D. Wright."[12] In a civil case, the duty to *1071 disclose to one's adversary arises through specific discovery requests. Pursuant to La. C.C.P. art. 1428, a party has a duty to supplement discovery requests as follows:
A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
. . .
(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which he knows that the response was incorrect when made, or he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
. . .
La. C.C.P. art. 1428. The trial court found that the defendants had no duty to supplement their undisputedly correct original answer to Request No. 20 when they found and obtained possession of the vehicle in 1999. We agree and find that not only was the response still true even after they obtained the car, but also that the circumstances do not show a knowing concealment.
When the discovery request was first propounded in 1989, plaintiffs knew that defendants could not have retrieved the vehicle from the accident site, as plaintiffs are the ones that sold the vehicle shortly after the accident, without defendants ever having the chance to see it. Thus, clearly, in propounding this request, they were not seeking the vehicle, but instead seeking anything defendants may have "retrieved from the accident site involved." To say now that this request could reasonably lead defendants to think it encompassed the vehicle is illogical. Further, as found by the trial court, "[n]owhere was it pointed out . . . that a more narrowly focused RFP or other discovery device was used by Plaintiff to learn of the subject vehicle's whereabouts after 8 December 1999 until [this nullity action was filed]." Certainly, if plaintiffs wanted to request production of the car at any time, they would have just plainly asked for production of the vehicle, especially after defendants told them in 1998 that the vehicle had been traced to Texas.
In addition, the circumstances do not give rise to a "knowing concealment." The defendants filed a Supplemental Exhibit List on November 23, 1998, notifying plaintiffs that they intended to produce as evidence a "Registration Certificate from Texas showing that Ned Wright's vehicle was sold to Mr. Hudson." As found by the trial court, "[h]ow could `concealment' be the main ingredient on the back end when `up front disclosure' appeared on the front end? To ask the question may be to answer it." In sum, we agree with the trial court that defendants had no duty to supplement Request for Production No. 20 with information that they had possession of the vehicle in 1999. That request did not encompass the vehicle, and defendants notified plaintiffs as early as 1998, although they had no obligation to do so, that they had traced the vehicle to Texas. Further, we do not find that arguing the previously filed second Spoliation Motion after they had acquired the vehicle constitutes fraud or ill *1072 practice, for that motion related only to the A-pillars, which undisputedly had been removed from the vehicle before defendants even became involved in the case.[13]
The next issue is due diligence. Absent a specific discovery request or "knowing concealment," where a party seeks to annul a judgment because the other party failed to disclose facts within his knowledge or things within his possession that would have been helpful to his case, that party cannot prevail when with reasonable diligence he could have ascertained those facts himself. Gladstone, supra; First Nat'l Life Ins. Co. v. Bell, supra. As we stated in Gladstone, "[t]he action for nullity based on fraud or ill practices is not intended as a substitute for an appeal or as a second chance to prove a claim which was previously denied for failure of proof." Gladstone, supra at 1222. Plaintiffs claim now that an examination of the vehicle could have bolstered their case in chief from both a defective products standpoint and an accident mechanics standpoint, bolstered the credibility of their experts, and allowed them a fair opportunity to counter the accident mechanism claims of the defense experts by showing that the physical evidence remaining on the car was inconsistent with defendants' contention of how the accident occurred. However, the time to do all this was at trial, and defendants' conduct did not prevent the plaintiffs from doing any of that at trial. If plaintiffs felt the car was important to their case, they should have at least attempted to look for it before trial, and just as they did in 2003, they surely would have found it. To the extent they relied on defendants to find the car for them or to let them know if they found the car, that reliance was unreasonable. The defendants told them as early as 1998 that the car had been traced to Texas; all they had to then do was search the Texas DMV records using the vehicle's VIN number. In fact they could have searched for the car using the VIN number at any time during the 12 years leading up to the trial, not to mention the fact that plaintiffs could have inspected the car before selling it to a third party with the consent of her attorneys, and could have inspected it at any time during the first year and one-half while it remained in Monroe. As stated by Judge Stewart in his dissent, "[i]t is the plaintiff's lack of diligence and deliberate decision to not seek the vehicle in question as part of its trial strategy that gave rise to the instant case."
Plaintiffs also claim that the trial court erred in granting the motion for summary judgment because it refused to allow plaintiffs to conduct any discovery before granting the motion. Article 966(C)(1) provides that "[a]fter adequate discovery or after a case has been set for trial, a motion which shows that there is no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law shall be granted." However, the discovery sought by plaintiffs related only to defendants' actions after they had purchased the vehicle, such as any inspections done, photographs, taken, etc. The information sought in the discovery plaintiffs claim they need in order to defend against the motion for summary judgment *1073 is irrelevant to the issue that plaintiffs needed to overcome in order to survive this motion for summary judgment, i.e., that they used due diligence in attempting to find the vehicle before trial. In fact, it is undisputed that plaintiffs did not exercise due diligence. The only evidence produced at the motion for summary judgment by plaintiffs on this issue was an affidavit of plaintiffs' counsel, Michael J. Mestayer, who stated:
I was not consulted regarding a potential product liability claim against Mercedes or any other party until March, 1989;
At the time I was first consulted in this matter, I determined that the Mercedes vehicle had been sold;
I contacted several individuals during the course of the legal proceeding herein about the possibility of locating the car, but was informed that since there was no available documentation to reflect the broker to whom the car was sold at the Dallas Auto Auction, that the vehicle could be anywhere in the U.S., or elsewhere, and that there was no way to locate it without sales documentation.
. . .
That I made a specific request to Timothy C. Smith on 8 December 1999, immediately following the second day of Daubert hearings, for information concerning the location of the car, at which time Mr. Smith denied that Mercedes had located the car;
That in the denial, Mr. Smith stated that they had tracked the car down as far as "some Hooter's girl", but lost it from there; and
That the only way that I was able to locate evidence that Mr. Smith had actually purchased the car was the fortuitous request to a previous woman owner of the car since the states of Louisiana, Texas, and California reported that they had no title documents reflecting ownership by anyone known to be associated with Mercedes.
Mr. Smith filed a counter-affidavit that no such question was ever asked of him. However, although apparently in dispute, this is not a material factual issue, because even if Mr. Mestayer had asked Mr. Smith if he had found the car in an off-the-record conversation, and even if Mr. Smith had responded that they had tracked the car but then lost it, when in fact they had actually found it, this would not constitute due diligence on Mr. Mestayer's part sufficient to overcome this motion for summary judgment.[14] Mr. Mestayer should have at least taken steps after that to locate the car which he now claims was such critical evidence, either in the form of discovery to defendants seeking any information they had in locating the car, or in performing a DMV search for the car. While plaintiffs now claim the car was very important, and thus material, to their case, they obviously did not think it was material at or before trial, as they made no attempt to locate it then.
Plaintiffs also argue, as asserted in Mr. Mestayer's affidavit, that even had they searched the DMV records after Mr. Smith purchased the car, they would not have found out that Mercedes had the car because the car was purchased in Mr. *1074 Smith's name. However, they would have seen that Mr. Smith, who was well known to them, had purchased the car, or at the very least they would have learned that Meredith Misenhalter had purchased the car, which would have led them to Mr. Smith. In any event, it would have been irrelevant at that time whether Mr. Smith had it or Mercedes had it; either way, plaintiffs would have found the car and could have examined it, if that's what they really wanted to do.
While the court of appeal ultimately held that the trial court erred in refusing any discovery prior to granting the motion for summary judgment because "[i]t is clear that there are genuine issues of material fact surrounding the Mercedes while it was in the custody of defendants," the court of appeal and the trial court noted the following undisputed material facts:
Plaintiffs had full custody and access to the vehicle before they ever filed suit. Plaintiffs intentionally sold the vehicle knowing full well that it would be repaired. Plaintiffs twice argued against defendants' spoliation motions, taking the position that the actual Mercedes and parts were irrelevant. Defendants informed plaintiffs that the Mercedes was in the Texas area in 1998; and plaintiffs made no effort to locate the vehicle until after the trial.
927 So.2d at 1277-78. Because plaintiffs failed to show, and in fact cannot show no matter how much discovery is allowed, a genuine factual dispute concerning their own lack of diligence in locating the vehicle, no further discover is necessary before granting the motion for summary judgment. Any issue concerning the vehicle's condition, i.e., whether it might have been helpful to the plaintiffs in the underlying action, is immaterial to this summary judgment motion.[15]See Hayes v. Autin, supra at 695 (on summary judgment, "a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.")

CONCLUSION
A nullity action based on fraud or ill practice is not intended as a substitute for an appeal or as a second chance to prove a claim that was previously denied for failure of proof. The mere failure to disclose information does not necessarily constitute fraud or ill practice. That determination depends upon the nature of the information and the circumstances surrounding the proceeding. Absent a specific discovery request or "knowing concealment," failing to disclose information that might have been helpful to the opposing party's case does not constitute fraud or ill practice if with, reasonable diligence, the party could have ascertained the information himself. In this case, there was no fraud or ill practice relating to defendants' failure to supplement their response to Request for Production No. 20, because the vehicle was not "retrieved from the accident site" or "taken from the vehicle in question following the death of Ned D. Wright."
While defendants' conduct in purchasing the vehicle unbeknownst to plaintiffs and not disclosing the purchase to the plaintiffs concerns us, we do not find that it deprived plaintiffs of a legal right or render the enforcement of the judgment unconscionable *1075 or inequitable. Simply put, nothing defendants did prevented the plaintiffs from locating the car in the 12 years before trial.

DECREE
For the reasons stated herein, the judgment of the court of appeal is reversed, and the judgment of the trial court granting defendants' motion for summary judgment is reinstated.
REVERSED.
KNOLL, J., dissents and assigns reasons.
KNOLL, J., dissenting.
For the following reasons, I respectfully dissent. In my view, the court of appeal correctly found the defendants' argument that they had no duty to disclose they had obtained possession and ownership of the subject vehicle to be specious. The defendants' actions show they consciously hid the fact that they had the car.
Although "[d]iscovery of evidence which could have been presented at the original trial usually cannot serve as the basis for an action for nullity," this court further explained that "the failure to disclose all information on the issue is not ill practice unless concealment or deceit is involved." Gladstone v. American Auto. Ass'n, Inc., 419 So.2d 1219, 1223 (La.1982)(emphasis added). Pursuant to La.Code Civ. Pro. art. 1428(2), a party has a duty to supplement responses to discovery requests when "he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment." (Emphasis added).
The defendants filed a second spoliation motion on July 31, 1998. After this motion was filed, defendants' attorney purchased the vehicle on March 1, 1999. Defendants did not inform the plaintiffs or the court of their purchase of the vehicle; indeed, they proceeded to argue their spoliation motion on August 23, 1999 without telling the court or the plaintiffs they had purchased the car. Moreover, the defendants filed a motion on August 13, 1999 to limit plaintiffs' expert witness testimony, arguing that plaintiffs' expert admitted he never saw Mr. Wright's vehicle. Significantly, defendants sought a writ from the denial of their motion, after they had obtained the vehicle.
Although "[t]here are persuasive considerations against disturbing the integrity of final judgments obtained without artifice," Johnson v. Jones-Journet, 320 So.2d 533, 537 (La.1975)(emphasis added), where, as here, a litigant employs deceit by omission (i.e., judgment obtained by fraud or ill practices), enforcement of such a judgment would be unconscionable and inequitable. In discussing "ill practices" under Code of Practice article 607, the source of La.Code Civ. Pro. art. 2004, this court stated:
Under the jurisprudence any improper practice or procedure which enables a party to obtain a definitive judgment comes within the meaning of this article. The courts have looked at each case from a purely equitable viewpoint to ascertain whether allowing the judgment to stand would be inequitable or unconscionable in view of the practice or procedure which enabled the party to obtain such judgment.

Alonso v. Bowers, 222 La. 1093, 1097, 64 So.2d 443, 444 (1953).
I find the actions of the defendants, in arguing a spoliation motion and seeking to limit the expert's testimony after they obtained the vehicle, was an improper practice that possibly enabled them to obtain the definitive judgment. Under these circumstances, the failure to supplement the discovery request was a knowing concealment that could serve as the basis for an *1076 action for nullity. The right to a fair and impartial trial is a legal right entitled to all participants in a legal proceeding. Belle Pass Terminal, Inc. v. Jolin, Inc., 01-0149, p. 7 (L.a 10/16/01), 800 So.2d 762, 767.
In support, I find the defendants' action of filing a Supplemental Exhibit List notifying the plaintiffs that they intended to produce as evidence a "Registration Certificate from Texas showing that Ned Wright's vehicle was sold to Mr. Hudson" does give rise to a knowing concealment, rather than the opposite, as found by the majority. In my view, it is disingenuous for the defendants to arbitrarily decide that they must provide partial information, but then decline to further reveal that they have obtained possession and ownership of the vehicle. If they truly believed there was no duty to supplement their response to Request For Production No. 20, there was no purpose in their disclosure that a Texas registration certificate showed the vehicle was sold to Mr. Hudson. Once the defendants disclosed the point to which the search for the vehicle had led, it was incumbent upon them to further reveal their additional knowledge, particularly where their counsel purchased the vehicle on their behalf.
In holding that the attorney-client privilege is waived where a client elects to partially disclose privileged communication, this court stated:
The rationale of a waiver based on partial disclosure is that permitting a party to make such an incomplete disclosure, without losing his privilege with respect to the remainder of the communication or communications on that subject would be unfair to the adversary because it would give the privilege-holder unchecked editorial control over the available evidence to a degree that would practically ensure a distorted presentation of the communication or communications. . . . A partial disclosure creates the additional risk of distorting or garbling the communication by allowing partial introduction without providing the opponent an opportunity to establish its true content and context.

Succession of Smith v. Kavanaugh, Pierson & Talley, 513 So.2d 1138, 1144 (La.1987).
Although not directly on point, I find this court's rationale in permitting privilege to be waived where the privileged material is partially disclosed significant in this matter, where the defendants' partial disclosure of relevant evidence gave them unchecked editorial control and ensured a distorted presentation.
Although it is tempting, because of the time span of this litigation, to grant the defendants' motion for summary judgment to achieve finality in this matter, I find to do so would countenance the fraud and ill practices committed by defendants. Notwithstanding the lack of due diligence on the plaintiffs' part, the defendants' fraud and ill practices mitigates against a grant of summary judgment, as correctly found by the court of appeal. Thus, I would affirm the appellate court's decision to reverse the trial court's grant of summary judgment, remanding this matter for further proceedings consistent with that ruling.
NOTES
[1] "Plaintiffs" are the spouse and children of the deceased.
[2] LP & L was dismissed before trial.
[3] MBNA is now known as Mercedes-Benz USA, LLC, ("MBUSA").
[4] In Paragraph XIII of the original Petition, plaintiffs alleged that the Mercedes was unreasonably dangerous for the following reasons:

a. The vehicle was unreasonably dangerous in construction or composition in that it failed to meet minimum rollover protection standards of defendant or of otherwise identical vehicle marketed elsewhere;
b. The vehicle was unreasonably dangerous in design and alternative feasible designs existed at the time which were capable of preventing the damage claimed;
c. The vehicle was unreasonably dangerous because of the failure to warn of dangers associated with rollover and the lack of occupant protection; and,
d. The vehicle was unreasonably dangerous because of non-conformity to the representations of the vehicle as a safe, stable, and extensively tested "sports car."
Daimler Benz Aktiengesellschaft (now known as DaimlerChrysler Aktiengesellschaft) was added as a defendant in the First Supplemental and Amending Petition and all allegations against MBNA were alleged against Daimler. Daimler was the parent corporation of MBNA, now known as MBUSA. In a Second Supplemental and Amending Petition, plaintiffs added the following allegations:
a. Failure to properly design, engineer, and/or manufacture the aforesaid 1982 Mercedes-Benz 380 SL;
b. Failure to equip the aforesaid 1982 Mercedes-Benz 380 SL with occupant crash safety equipment, including but not limited to a rollover bar, headache bar, bulkhead and/or windshield of sufficient strength to withstand a foreseeable rollover event;
c. Failure to provide proper and safe guidelines and/or warnings for the use of said vehicle.
[5] At oral argument on the motion in the trial court, defense counsel stated that the actual Texas title history referred to in the Supplemental Exhibit List was in the courtroom at trial in defendants' Exhibit Book.
[6] Plaintiffs also filed a "Rule to Show Cause Why the Court Should Not Grant Action Seeking Equitable Remedies Declaring Judgments Null and Ordering a New Trial Based Upon Fraud or Ill Practices." These actions were consolidated and transferred to the trial judge in the original case, Judge Alvin R. Sharp.
[7] Specifically, the court found:

Looking to the principle pleading at hand, this Court finds it difficult to discern where Plaintiff stated facts relating to "diligence" or how "diligence" was showed. Looking to the applicable pleading at hand, this Court finds it difficult to discern where Plaintiff stated facts relating to how the subject vehicle would have been helpful to their original cause of action. Looking to the applicable pleading at hand, this Court finds it difficult to discern where Plaintiff stated facts relating to either of these, and  together with that mentioned above  the exception should be, and is hereby, SUSTAINED.
[8] In Johnson, Justice Marcus explained that Article 2004 was drawn from Article 607 of the Code of Practice, which, in addition to stating the general rules, set forth as illustrations of fraud or ill practice the following: bribery of the judge or witnesses, production of forged documents, and perjury by the party obtaining the judgment. 320 So.2d at 537. Justice Marcus noted that these illustrations were not considered an exhaustive list, and that although the illustrations were deleted with the adoption of Art. 2004, there was no intention to change the law. Id.
[9] Kem Search, as well as Power Marketing, supra, and Russell v. Illinois Central Gulf Railroad, 96-2649 (La.1/10/97), 686 So.2d 817, involved default judgments taken without notice to the opposing parties. This line of cases hold that a judgment of default may be annulled in certain circumstances when a party fails to defend a suit because of the failure of the opposing party to warn it that a default would be taken.
[10] In Belle Pass, one of the defendants was secretly aligned with the plaintiffs, and the Court found that his testimony at trial, including material misrepresentations, influenced the jury's finding in favor of the plaintiffs, denying the other defendant of his legal right to a fair and impartial trial. Id.
[11] We note plaintiffs' argument that the trial court erred in considering the exception of no cause of action together with the motion for summary judgment. In Gladstone, supra, this Court noted that "the combined pleading, urging an exception of no cause of action and a motion for summary judgment, is a much more useful procedural device than the exception alone." 419 So.2d at 1222, n. 3. Further, in this case we have just held that it was legal error for the trial court to grant the exception of no cause of action because the face of the petition was sufficient to overcome that exception. At the hearing on the exceptions and motion, the plaintiffs argued that the two could not be considered together and the trial court acknowledged that only the petition could be considered in ruling on the exception. In addition, while the trial court granted the exception of no cause of action, perhaps using facts outside the face of the pleadings, it also separately granted the motion for summary judgment as follows: "for the same and/or similar reasons [as it granted the exception of no cause of action], this Court finds the absence of any genuine issue as to any material fact and the moving party, in the alternative, is entitled to judgment as a matter of law." Thus, even if the trial judge did err in considering matters outside the face of the pleadings in considering the exception of no cause of action, that error does not affect his ruling on the motion for summary judgment.
[12] While plaintiffs now argue in brief and at oral argument the judgment should be nullified because defendants also had a duty to supplement Request for Production of Documents No. 5, requesting any photographs or videotapes of the vehicle, with photographs taken after defendants had possession of the vehicle, this was not alleged in the petition, and was not considered by the trial court or the court of appeal. Further, we fail to see how photographs of the repaired car would have assisted plaintiffs' case under their theory of the case, i.e., design defect, any more than the actual car would have assisted them. See also, p. 1074, n. 15, infra.
[13] In addition, while defendants questioned the plaintiffs' expert's qualifications because he did not examine the vehicle, this did not prevent plaintiffs from having a fair trial as the trial court denied defendants' disqualification motion and allowed him to testify. Further, while plaintiffs complain of defendants' use of an exemplar vehicle when they in fact had the actual vehicle, we find that based on plaintiffs' design defect and failure to warn claims, and the fact that plaintiffs asserted the A-pillars had bent above the belt line and these A-pillars had undisputedly been replaced, the actual vehicle would not have served as well as the exemplar vehicle in defending against plaintiffs' claims.
[14] Mr. Mestayer's affidavit does allege a violation of the Rules of Professional Conduct. Rule 4.1 states: "In the course of representing a client a lawyer shall not knowingly: (a) Make a false statement of material fact or law to a third person . . ." Whether this conversation took place is an issue in dispute because of Mr. Smith's counter affidavit. However, this is not an attorney disciplinary proceeding, it is a nullity action, and even if Mr. Smith did make this false statement, it did not prevent plaintiffs from presenting their case or having a fair trial because it did not prevent them from finding the car if they had tried to do so.
[15] Although we do not have the record of the original trial before us, we presume plaintiffs attempted to prove the allegations contained in their petition and supplemental petitions by expert testimony. The ability of plaintiffs to prove the vehicle and its parts were defectively designed was not dependant on the actual vehicle. Further, if claiming Wright's vehicle was defectively built, there was no way the actual vehicle was going to prove it because Mrs. Wright had sold the vehicle and all relevant parts had been replaced.