| YI-ZARN WANG | * | NO. 2020-CA-0249 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| J. PHILLIP BOUDREAUX, M.D.; OCHSNER MEDICAL CENTER - KENNER, L.L.C.; OCHSNER CLINIC FOUNDATION; AND OCHSNER HEALTH SYSTEM | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| | * * * * * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2017-11867, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Edwin A. Lombard**
* * * * * *
(Court composed of Judge Edwin A. Lombard, Judge Rosemary Ledet, Judge
Tiffany G. Chase)

Michael Patrick Doyle
Patrick Dennis
Jeff Avery
DOYLE LLP
3401 Allen Pkwy, Suite 100
Houston, TX 77019

Paul M. Sterbcow
Ian F. Taylor
LEWIS, KULLMAN, STERBCOW & ABRAMSON, LLC
601 Poydras St., Suite 2615
New Orleans, LA 70130


        COUNSEL FOR PLAINTIFF/APPELLANT


Jeff Landry
Attorney General

Kelli M. Khalaf
J. Marc Vezina
Special Assistants
Attorney General
VEZINA AND GATTUSO, L.L.C.
401 Weyer St., P. O. Box 461
Gretna, LA 70054

Pauline F. Hardin
Tyler J. Rench
JONES WALKER LLP
201 St. Charles Avenue, 49th Floor
New Orleans, LA 70170

Judith W. Giorlando
BREAZEALE, SACHSE & WILSON, L.L.P.
301 Main St., Suite 2300
One American Place
Baton Rouge, LA 70801


COUNSEL FOR DEFENDANTS/APPELLEES

**AFFIRMED**


**JANUARY 15, 2020**

EAL

RML

TGC

By devolutive appeal, Yi-Zarn Wang, M.D. (the plaintiff), challenges the district court judgments in favor of the defendants, Ochsner Medical Center-Kenner, L.L.C., Ochsner Clinic Foundation, Ochsner Health System (hereinafter "Ochsner"), and Dr. J. Philip Boudreaux, dismissing all of Dr. Yang's claims with prejudice. After *de novo* review of the record in light of the applicable law and arguments of the parties, we affirm the district court judgments.

***Relevant Facts and Procedural History***

In 2005, Dr. Wang was hired by Louisiana State University Health Sciences Center New Orleans ("LSU") as a faculty member; concomitantly, Dr. Wang applied for and received clinical privileges at Ochsner as non-employed (by Ochsner) medical staff. As required by Ochsner, Dr. Wang re-applied every two years to maintain his privileges at Ochsner. By letter of June 30, 2015, Dr. Wang's most recent appointment to the active Ochsner Medical Staff (for the term 7/31/2015-7/31/2017) was confirmed; the confirmation letter included a copy of the current Ochsner Code of Conduct ("Policy 13") and Dr. Wang was advised that

1

the current Ochsner Bylaws (pertaining to clinical privileges as implemented by the Ochsner Medical Executive Committee ("MEC")) were available for his review in the Medical Staff office. It is undisputed that these documents constitute the contract between the parties.

In November 2015, an Ochsner patient[1] diagnosed with appendicitis expressed concern about Dr. Wang's non-surgical medical management of his appendicitis and requested a second opinion. Subsequently, Dr. Wang received a letter (dated December 18, 2015) from the Ochsner Medical Leadership Council ("MLC") informing him that: (1) the patient's complaint about Dr. Wang's course of treatment had been reviewed; (2) non-surgical medical management was neither recognized nor authorized treatment by Ochsner for patients clinically diagnoed with appendicitis; and (3) the matter had been referred to the MEC for further review.

In February 2016, Dr. Wang received a letter from the MEC confirming its review and advising Dr. Wang in clear terms *"non-surgical medical management of patients with appendicitis is not a privilege/practice available to Ochsner Medical Staff."* (Emphasis added). In April 2016, Dr. Wang treated another Ochsner patient diagnosed with appendicitis in the Emergency Room ("ER") and transferred to general surgery. Dr. Wang confirmed the diagnosis but, contrary to the explicit instructions received from the MEC and MLC, made the following entry into the patient's record on April 20, 2016:

---

.[1] The medical records in this matter are sealed.

. . . I have [sic] a long discussion with the patient about the treatment option evolution in the last 20 years. I have [sic] told her about my view and the literatures [sic] that back up my evidences based practice and the position of the hospital committee I also advised her she can request for [sic] another surgeon to provide care if she prefers. She said she likes my view and [sic] willing to address her problem with abx as the first line tx.

The patient, discharged from Ochsner on April 22, 2016, underwent an emergency appendectomy surgery that same day at Touro Infirmary.

On May 27, 2016, Dr. Wang received a hand-delivered letter from the MEC informing him that his non-surgical treatment of the April 2016 Ochsner appendicitis patient was in direct violation of its instructions to Dr. Wang to discontinue all non-surgical medical management of patients with appendicitis. In addition, the MEC found Dr. Wang's medical entry regarding his disagreement with the Ochsner policy regarding appendicitis care to be derogatory, impugning the Ochsner quality of care and inappropriately disclosing confidential peer review information in violation of the Ochsner Code of Conduct. Accordingly, Dr. Wang was informed that: (1) his clinical privileges were suspended for a five day period, May 27-June 1, 2016; and (2) to maintain his clinical privileges Dr. Wang was required to return a signed copy of the letter to signify his agreement to the personal professional conduct plan put forth in the letter requiring him to comply with MEC policy directives and refrain from making derogatory comments about the Ochsner quality of care or disclosing information pertaining to the Ochsner confidential peer review process; and (3) his failure to provide this signed copy of the letter to the Medical Staff office by the allotted time would constitute "*a voluntary resignation of your OMC-K Medical Staff membership and clinical privileges.*" (Emphasis in original).

3

Dr. Wang signed the receipt verifying he received the letter dated May 27, 2016, on that same date. Nonetheless, he failed to timely return the requisite signed copy of the letter acknowledging his acceptance and agreement to the proposed professional conduct plan. As forewarned, Dr. Wang's clinical privileges were relinquished as of May 31, 2016.

Rather than re-apply for clinical privileges (the appropriate course of action as advised by both Ochsner and Dr. Wang's supervisor on the LSU faculty[2]), Dr. Wang filed a federal lawsuit against Ochsner and his Ochsner/LSU colleague, Dr. J. Philip Boudreaux, alleging that they conspired against him in violation of the federal Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"). The federal district court dismissed Dr. Wang's RICO claims with prejudice.[3] *Wang v. Ochsner Med. Ctr-Kenner, LLC*, 17-5134 (E.D. La. 12/7/2017), 2017 WL 10065713.

Shortly thereafter, Dr. Wang filed this lawsuit in state court, again naming Ochsner and Dr. Boudreaux[4] as defendants and alleging that Ochsner and Dr. Boudreaux, their agents, employees, and "other third parties"[5] acted in concert in a civil conspiracy to defraud him and other illegal and wrongful activities by diverting his patients to Dr. Boudreaux. More specifically, Dr. Wang asserted claims for (1) breach of contract; (2) negligent misrepresentation; (3) tortious

---

[2] Notably, when a practitioner voluntarily relinquishes privileges, as in this case, the practitioner can *immediately* submit a new application of reinstatement of membership or clinical privilege. If the practitioner's re-application is denied, then the right to a hearing attaches, pursuant to Article 8.1 of the Bylaws. Accordingly, to maintain his privileges at Ochsner or, alternatively, receive a hearing on the matter, Dr. Wang should have filed a reapplication for clinical privileges as advised by both Ochsner and LSU supervisors.

[3] Dr. Wang's state claims were dismissed without prejudice.
[4] Although the acts took place in in Jefferson Parish, Dr. Wang filed the claim in Orleans Parish because Dr. Boudreaux is a resident of Orleans Parish,
[5] Dr. Wang specifically names the MEC, another Ochsner doctor and an Ochsner employee as co-conspirators.

4

interference with Dr. Wang's relationships in the medical community; and (4) violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (LUPTA) La. Rev. Stat. 51:4101, *et seq*. Pursuant to La. Code Civ. Proc. art. 3601, Dr. Wang also sought injunctive and declaratory relief with respect to his suspension from practice and loss of hospital privileges.

On April 15, 2019, Dr. Wang filed a motion for partial summary judgment on his breach of contract claim; on May 22, 2019, Ochsner filed a cross-motion for partial summary judgment on Dr. Wang's breach of contract claim, pointing out that its action fully complied with the contract between the parties. After a hearing on June 21, 2019, the district court entered judgment on July 18, 2019, granting Ochsner's cross-motion for partial summary judgment, denying Dr. Wang's motion for partial summary judgment, and dismissing Dr. Wang's breach of contract claim with prejudice.

Subsequently, both Ochsner and Dr. Boudreaux filed motions for summary judgment on Dr. Wang's remaining claims: Ochsner pointed out that as part of his 2015 reapplication for clinical privileges Dr. Wang granted broad immunity to Ochsner and agreed not to sue for any actions taken by Ochsner towards him; Dr. Boudreaux pointed out that Dr. Wang cannot satisfy his burden of proof at trial on his claims made against Dr. Boudreaux. The district court agreed and, on February 3, 2020, granted summary judgment in favor of Ochsner and Dr. Boudreaux and dismissed Dr. Wang's lawsuit with prejudice.

Dr. Wang timely filed this appeal challenging the district court judgments.

***Standard of Review***

A district court's ruling on summary judgment is reviewed *de novo*, using the same criteria that governs the district court's consideration of whether summary

5

judgment is appropriate, *i.e.,* whether there is any genuine issue of material fact and whether the movant is entitled to summary judgment as a matter of law. *Wright v. Louisiana Power & Light,* 2006-1181, p. 17 (La. 3/9/07), 951 So.2d 1058, 1070.

### *Summary Judgment*

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Beer Indus. League of Louisiana v. City of New Orleans,* 2018-0280, p. 7 (La. 6/27/18), 251 So. 3d 380, 385-86. Summary judgment, designed to secure the just, speedy, and inexpensive determination of civil actions (with the exception of certain domestic matters), is favored under Louisiana law. La. Code Civ. Proc. art. 966(A)(2). Accordingly, "[a]fter an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law." La. Code Civ. Proc. art. 966(A)(3).

### *Burden of Proof*

On motion for summary judgment, the burden of proof remains with the movant. La. Code Crim. Proc. art. 966(D)(1). However, when a moving party will not bear the burden of proof at trial and points out there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the burden is on the non-moving party to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. *Id.*

6

***Dr. Wang's Claims against Ochsner***

Dr. Wang argues that the district court erred in denying his Motion for Partial Summary Judgment on his breach of contract claim, granting Ochsner's Cross-Motion for Summary Judgment on Dr. Wang's breach of contract claim, and granting Ochsner's Motion for Summary Judgment on the remaining claims against Ochsner.

*Applicable law*

The essential elements of a breach of contract claim are: (1) the existence of a contract; (2) the party's breach thereof; and (3) resulting damages. *Padian v. Algiers Charter School Association, Inc.,* 2019-0201, p. 3 (La. App. 4 Cir. 6/19/19), 274 So.3d 1266, 1268 (citation omitted). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ. Code art. 2046.

*Discussion*

In his motion for partial summary judgment, Dr. Wang asserts that (1) a contract existed based on his application to Ochsner for privileges and the parties' mutual agreement to Ochsner's Bylaws, and (2) Ochsner breached this contract when it revoked Dr. Wang's privileges without following the hearing procedures as required in the Bylaws.

In its response and cross-motion, Ochsner points out that its course of action fully complied with Ochsner policies and procedures and, hence, the contract between the parties. In support of its motion, Ochsner submits copies of the documents creating the contract, specifically, Dr. Wang's most recent (2015) re-application (entitled Conditions of Reappointment Application-Release and

Immunity), the Ochsner Bylaws of the Medical Staff,[6] including Medical Staff

Policies and, most particularly, Policy 13 - the Ochsner Code of Conduct. By

signing his 2015 re-application, Dr. Wang confirmed that he read the Bylaws and

related documents and was bound by them. Thus, by the terms of the contract

between the parties, Dr. Wang acknowledged and agreed to the following in return

for clinical privileges at Ochsner:

> 1) He would abide by the Bylaws and Policies, and other requirements of the Medical Staff and the Hospital. Bylaws art. 3.4(D).

> 2) He would participate in peer review, performance improvement, risk management, case management, and other review and improvement activities as requested. Bylaws art. 3.4(G).

> 3) He was subject to review by the Medical Staff and his performance could be evaluated whenever the MEC deemed it necessary. Bylaws art. 3.4(J).

> 4) He was subject to Ochsner's peer review process, a procedure specifically designed to address issues related to an individual's clinical practice and/or professional conduct and to resolve in a collegial manner all questions raised through the voluntary and responsive action of the individual involved. Bylaws art. 7.1.

> 5) Intervention efforts by the MLC were part of Ochsner's professional and peer review activities. Bylaws art. 7.1 (A).

> 6) Most specifically, Ochsner intervention efforts were designed to review and follow up on questions raised about the clinical practice and/or conduct of its staff members through peer counseling, education and related steps such as advising colleagues of all applicable policies regarding appropriate behavior through peer review, monitoring, and letters of guidance to share and provide relevant information, including any variations from clinical protocols or guidelines, in order to assist individuals to conform their practice to appropriate norms. Bylaws art. 7.1(B).

> 7) Determination of applicable intervention efforts were within the

---

[6] Bylaws of the Medical Staff, Section 3.4 entitled "General Obligations and Conditions for Medical Staff Appointment/Reappointment" clearly states that "By submitting an application of reapplication for Staff membership, the applicant signifies agreement to fulfill the following obligations and conditions": . . . (D) Abide by these Bylaws and the Policies, and other requirements of the Medical Staff and the Hospital."

discretion of the MLC.

8) The determination as to whether a matter was handled in accordance with a Policy, such as the Policy on Physician Health or the Code of Conduct and whether to conduct further review and determination under the Bylaws was within the discretion of the MLC. Bylaws art. 7.1 (E).

9) When a serious matter was raised or collegial efforts did not resolve an issue involving the clinical practice (including the care, treatment, or management of a patient or patients) of a member of the Medical Staff, the matter would referred to the MEC to make a sufficient inquiry as to the credibility of the question. Bylaws art. 7.2.

10) The MEC determined the course of action to follow in matters involving questions concerning clinical competence and professional conduct. Bylaws art. 7.3(A).

11) Derogatory comments and inappropriate medical entries impugning the quality of care being provided at Ochsner, as well as the refusal to abide by Medical Staff requirements delineated in the Bylaws and Policies and an unwillingness to work cooperatively and harmoniously are specific examples of inappropriate conduct subject to review under Policy 13, the Code of Conduct. Policy 13.2(E), (F), & (H).

12) Once the MLC determined that an incident of inappropriate conduct has occurred, its options included (but were not limited to) sending the practitioner a letter of guidance about the incident and/or a letter of warning or reprimand, particularly if there have been prior incidents and a pattern may be developing. Policy 13.5(B)(2) & (4).

13) It was within the discretion of the MLC to continue to utilize the steps outlined in Policy 13 if there was a reasonable likelihood that such action would resolve the concerns but at any point the MLC could refer the matter to the MEC. Policy 13.5(E) & 13.6(A).

14) It was within the discretion of the MEC to issue a letter of warning or reprimand; require a behavior modification course; impose a "personal" code of conduct on the practitioner making continued appointment and clinical privileges contingent on the practitioner's adherence to the prescribed code of conduct; and to suspend the practitioner's clinical privileges for less than 30 days. The imposition of any of these actions does not entitle the practitioner to a hearing or an appeal. Policy 13.6(B)(3), (4), (5), & (6).

15) Finally, the Conditions of Reappointment Application signed by Dr. Wang in submitting his 2015 re-application clearly states that by re-applying for clinical privileges, he extended absolute immunity to

Ochsner, agreed not to sue, and released from any and all liability Ochsner, its medical staff, and appropriate third parties for actions taken towards him. Conditions of Reappointment Application Section B(1).

In his reply brief and response to Ochsner's cross-motion, Dr. Wang acknowledges his contract with Ochsner consists of the documents related to his re-application, namely the Bylaws and Policy 13. Inexplicably, however, he continues to insist that Ochsner lacked a factual basis for its actions and that a hearing was required. As the above summary of the pertinent contract provisions indicates, Dr. Wang's clinical privileges at Ochsner were just that, privileges granted subject to his adherence to Ochsner rules and policies, not a protected entitlement subject to constitutional due process rights.

Dr. Wang does not dispute that he advocated non-surgical treatment of appendicitis for an Ochsner patient, that the patient complained and sought a second opinion, that he was advised by the MEC and MLC that non-surgical treatment of appendicitis was not acceptable at Ochsner, that he continued to pursue non-surgical treatment with a subsequent Ochsner patient despite specific instructions that this was contrary to Ochsner policy, that he received the letter advising him of imposition of a 5-day suspension with a personal professional conduct plan and a deadline to return a signed copy of the letter as acknowledgment of his agreement to the conduct plan for maintenance of his clinical privileges, and that he failed to timely comply with this mandate. Viewing these undisputed facts in light of the contract between the parties, Ochsner is entitled to summary judgment on Dr. Wang's breach of contract claim as a matter of law. Accordingly, the district court did not err in denying Dr. Wang's motion and granting summary judgment in favor of Ochsner on the breach of contract

10

claim.

The remaining claims in Dr. Wang's petition against Ochsner are as follows: Ochsner negligently misrepresented that it was authorized to terminate his privileges; Ochsner tortuously interfered with Dr. Wang's business relations by terminating his clinical privileges; Ochsner violated LUTPA by misrepresenting to his patients how he lost his privileges (Ochsner purportedly told Dr. Wang's patients that he retired rather than that his privileges were terminated for failing to adhere to Ochsner rules and policies; Dr. Wang claims this is actionable because he did not retire); and Ochsner should be compelled to remove the suspension and revocation of Dr. Wang's privileges from its files. All of these claims flow from Dr. Wang's breach of contract claim and are within the broad immunity granted by Dr. Wang to Ochsner. In his motion for partial summary judgment on the breach of contract claim, Dr. Wang argued that Ochsner's contractual-waiver defense was invalid because Ochsner maliciously breached its contract with him. In its cross-motion for partial summary judgment on the breach of contract claim, Ochsner addressed the substantive issue – its compliance with the contract between the parties – and the district court granted summary judgment in favor of Ochsner on that issue, denying Dr. Wang's motion on the breach of contract claim, as well as his motion on Ochsner's affirmative contractual-defense. Because there was no breach of contract by Ochsner, much less a vicious one, the broad contractual immunity granted by Dr. Wang to Ochsner is valid.

Accordingly, after *de novo* review of the motions for summary judgment between Ochsner and Dr. Wang, we find no genuine issue of material fact exists between the parties and Ochsner is entitled to summary judgment and dismissal of Dr. Wang's claims as a matter of law.

11

### Dr. Wang's Claims against Dr. Boudreaux

In his petition for damages, Dr. Wang also named his colleague, Dr. Boudreaux, as a defendant, alleging that Dr. Boudreaux acted fraudulently in concert with others to divert his patients by misrepresenting his availability and in violation of LUPTA. Specifically, Dr. Wang alleges that Dr. Boudreaux, with the aid of a Ochsner staff member, was responsible for steering patients from Dr. Wang to himself and this resulted in a decrease in the number of patients Dr. Wang treated and, concomitantly, in his income.

*Applicable Law*

"Fraud is a misrepresentation or a suppression of the truth made with the intention to either obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. Civ. Code art. 1953. "The two essential elements of fraud are the intent to defraud or gain and unfair advantage and actual or probable damage." *Dutton & Vaughan, Inc. Spurney,* (La. App. 4th Cir. 1992), 600 2d 1992, 698. Fraud cannot be predicated on negligence, no matter how gross; fraudulent intent, which constitutes the intent to deceive, is a necessary element of fraud. *Whitehead v. American Coachworks, Inc.* 2002-0027, p. 6 (La. App. 1 Cir. 12/20/02), 837 So.2d 678, 682.

LUTPA makes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. La. Rev. Stat. 51:1405. "A practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous or substantially injurious." *NOLA 180 v. Treasure Chest Casino, LLC,* 2011-853, p. 5 (La. App. 5 Cir. 3/27/12), 91 So.3d 446, 457 (citations and internal quotations omitted). Traditionally, causes of action under LUPTA are limited to consumers and

business competitors. *Id.,* "[C]ourts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.,* 2009-1633, p. 10 (La. 4/23/10), 35 So.3d 1053, 1059 (citation and internal quotations omitted).

*Discussion*

It is undisputed that Dr. Wang and Dr. Boudreaux were both neuroendocrine cancer specialists on the LSU faculty with clinical privileges at Ochsner. Prior to 2013, Dr. Wang's compensation was based on seniority and the number of surgeries ("RVUs") he performed but, in 2013, he entered into a revenue sharing agreement with Dr. Boudreaux wherein they shared all surgical fees, as well as clinical call and evaluation fees.

In his motion for summary judgment, Dr. Boudreaux points out that Dr. Wang will be unable to produce evidence at trial to support his allegations of fraud or of any effort to steer his patients towards Dr. Boudreaux. In support of his motion for summary judgment, Dr. Boudreaux submits, in pertinent part, the following deposition testimony:

> 1) Dr. Wang conceded that Dr. Boudreaux did not want Dr. Wang to leave because "[w]e only have two surgeons on the service" and, if one left, the other would be on call every day and night; in addition, Dr. Wang conceded this operational strategy prevented internal competition and there was no benefit to Dr. Boudreaux to have more patients than Dr. Wang.
>
> 2) Dr. Wang conceded he only scheduled one half day per week to see patients at the clinic; Dr. Boudreaux had four clinic days per week for seeing patients. Dr. Wang did not schedule surgeries before 9:30 am; Dr. Boudreaux began his surgery schedule at 7:30 am.
>
> 2) Dr. Wang stated that in the 2014-2016 period, his RVUs dropped (Dr. Wang performed 87, 86, and 25 surgical procedures; Dr. Boudreaux performed 255, 22, and 206 in the same period but,

13

because of the agreement with Dr. Boudreaux, their incomes remained comparable (Dr. Wang's compensation from July 1, 2015 to June 30, 2016, was $362,010; Dr. Boudreaux's was $362,677).

(3) Dr. Wang stated that his 2016 employment contract with LSU required clinical privileges at Ochsner, Touro Infirmary, or University Medical Center and that he retired from LSU in December 2016; he did not have clinical privileges at any of these hospitals between losing his privileges at Ochsner and retiring from LSU. Dr. Wang testified that he began working for Baylor on January 8, 2018, and received over $400,000 in compensation for that year.

4) Dr. Wang conceded that it was the policy of the Neuroendocrine Clinic that patients were first seen by the Director of the clinic or another doctor and then assigned to a surgeon; Dr. Boudreaux was not involved in the process.

5) Dr. Wang's witness, Ann Porter (a nurse at the Neuroendocrine Clinic) testified by deposition that the new patient protocol required initial screening and then assignment to a surgeon on a rotational basis; no changes were made to the surgical schedule once it was made.

6) Although Dr. Wang alleged that his patients were steered to Dr. Boudreaux by providing misleading information about his retirement from LSU, he was unable to provide specific information, stating that he thought one of his patients was told in the "late part of – of 2016, I believe" that he had retired from LSU; Dr. Wang retired in December 2016.

In response, Dr. Wang argues that he has provided sufficient evidence of loss to support his LUPTA claim. However, Dr. Wang's only evidence submitted in support of this is to point to Dr. Boudreaux's deposition testimony wherein Dr. Boudreaux concedes that his income increased after Dr. Wang left Ochsner. Dr. Wang also alleges that Dr. Boudreaux had an inappropriate relationship with an Ochsner nurse who, based on this relationship, misled Dr. Wang's patients as to his availability after Dr. Wang left Ochsner. As evidence of this, Dr. Wang points to emails from the staff member who, in response to a query from the Ochsner CEO, states that after Dr. Wang left Ochsner her staff had been instructed to inform patients that Dr. Wang was not available and, if patients "pushed" the issue, they

14

were advised to tell them that "we do not know" of his availability and, ultimately, to offer them the opportunity to see other physicians. Dr. Wang points out in his brief, however, that the staff member "further confirmed that this misleading message to patients [the claims that Dr. Wang was not available] came from the administration."

Thus, the only evidence Dr. Wang offers to support his contentions of Dr. Boudreaux's purported fraud and LUPTA violation are that Dr. Boudreaux's income increased once he became the only endocrine surgical specialist at the clinic after Dr. Wang lost his Ochsner clinical privileges (thereby invalidating the revenue sharing agreement that Dr. Boudreaux had entered into so that he was not constantly on call); and that the Ochsner administration instructed its staff to characterize Dr. Wang's absence as being unavailable rather than, presumably, explaining the circumstances of Dr. Wang's loss of clinical privileges. Notably, when asked for specifics as to his allegations that Ochsner misrepresented his availability, Dr. Wang could only reference a wife of a patient who he thought had been told he retired in December 2016.

Dr. Wang did, in fact, retire from LSU in December 2016. Dr. Wang does not present any evidence that he was "available" to his patients after he left Ochsner or that he provided the particulars of his availability to Ochsner for disbursement. Moreover, in light of his lack of clinical privileges in the interim between leaving Ochsner and retiring from LSU (his application for privileges at UMC and Touro were withdrawn when he retired from LSU, indicating that neither application had been accepted), it is difficult to imagine a scenario in which Dr. Wang was "available" in any practical sense to patients. Finally, Dr. Wang has failed to show any economic damages to support his LUPTA claims; while he had

15

clinical privileges at Ochsner, his income was comparable to that of Dr. Boudreaux; his loss of income due to the lack of clinical privileges (presumably required for any kind of surgery) is due to his own actions and not attributable to Dr. Boudreaux; and by his own admission, his income increased with his new position at Baylor which, presumably, was accompanied with the necessary clinical privileges.

Accordingly, after *de novo* review of Dr. Boudreaux's motion for summary judgment, we find that, as Dr. Boudreaux points out, Dr. Wang cannot meet his burden of proof at trial. As previously discussed, Dr. Wang's loss of clinical privileges at Ochsner was based on his own decisions and not attributable to Dr. Boudreaux. As Dr. Wang conceded, there was no benefit in Dr. Boudreaux gaining more patients than Dr. Wang as the income remained evenly divided whether or not the surgeries were equitably distributed. Similarly, Dr. Wang submits evidence clearly indicating that the Ochsner staff responses to Dr. Wang's patients regarding Dr. Wang's availability are not attributable to Dr. Boudreaux. Accordingly, Dr. Boudreaux is entitled to summary judgment as a matter of law.

***Conclusion***

The judgments of the district court are affirmed.

**AFFIRMED**