# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 21-357

**FERNEN LOUIS ANDREPONT, ET AL.**

**VERSUS**

**CHEVRON USA, INC., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2008-10045 "A"
HONORABLE SCOTT J. PRIVAT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Candyce G. Perret, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Stephen Barnett Murray**
**Arthur M. Murray**
**Jessica W. Hayes**
**Murray Law Firm**
**701 Poydras St., Ste. 4250**
**New Orleans, LA 70139**
**(504) 525-8100**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Fernen Louis Andrepont, et al.**


**Warren A. Perrin**
**Perrin, Landry, DeLaunay, Dartez, & Ouellet**
**P. O. Box 53597**
**Lafayette, LA 70505**
**(337) 233-5832**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
 **Fernen Louis Andrepont, et al.**


**Michael Gregory Stag**
**Ashley M. Liuzza**
**Matthew D. Rogenes**
**Edmond L. Guidry, IV**
**Smith Stag, LLC**
**365 Canal St., #2850**
**New Orleans, LA 70130**
**(504) 593-9600**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Fernen Louis Andrepont, et al.**


**Korey A. Nelson**
**Burns Charest, LLP**
**365 Canal Street, Ste 1170**
**New Orleans, LA 70130**
**(504) 799-2845**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
 **Fernen Louis Andrepont, et al.**


**Tommy Woods Thornhill**
**Thornhill Law Firm**
**1308 Ninth Street**
**Slidell, LA 70458**
**(985) 641-5010**
**COUNSEL FOR THIRD PARTY DEFENDANT:**
 **Jennings-Heywood Oil Syndicate**

**Michael R. Phillips**
**Claire E. Juneau**
**Jeffrey J. Gelpi**
**Claire M. Zeringue**
**Kean Miller LLP**
**First Bank and Trust Tower**
**909 Poydras St., Suite 3600**
**New Orleans, LA 70112**
**(504) 585-3050**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Chevron USA, Inc.**


**L.Victor Gregoire, Jr.**
**Charles S. "Trey" McCowan III**
**John C. Funderburk**
**Kean Miller LLP**
**400 Convention Street, Suite 700**
**Baton Rouge, LA 70802**
**(225) 387-0999**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Chevron USA, Inc., et al.**


**Thomas E. Balhoff**
**Judith R.E. Atkinson**
**Carlton Jones, III**
**Roedel, Parsons, Koch, Frost**
**8440 Jefferson Hwy. #301**
**Baton Rouge, LA 70809-7652**
**(225) 929-7033**
**COUNSEL FOR INTERVENOR/APPELLEE:**
    **Louisiana Department of Natural Resources**

**SAVOIE, Judge.**

Plaintiffs-Landowners in this oilfield contamination case appeal the summary judgment dismissal of their claims against the only remaining Defendant, Chevron U.S.A., Inc. ("Chevron"). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This court previously stated as follows with respect to this litigation:

> The plaintiffs are individual owners of immovable property located in Acadia Parish, Louisiana, located near the historic Jennings Field, the site of the first oil production in Louisiana. This litigation began on January 16, 200[8], when the plaintiffs, Fernen Louis Andrepont, Stacy H. Britt, Barbara Miller Chapman, Glenn D. Daigle, Sr., Anita D. Decker, the Fruge Children Trust, Raven Gotte, Jr., Carroll Hebert, David Wayne Hebert, Norman Hebert, Aulden R. Miller, Kenneth L. Miller, Jr., Steven J. Simar, and Patricia A. Vidrine, filed suit against twelve named defendants[1] seeking damages for the contamination of their properties caused by oil and gas exploration in the nearby Jennings Field. . . .
>
> In their petition, the plaintiffs asserted their ownership of individual tracts of immovable property located in Sections 42 and 43, Township 9 South, Range 2 West, in Acadia Parish. They alleged that . . . [D]efendants, in conducting oil and gas drilling and production activities on or near their properties, had in the past utilized unlined earthen pits for the storage of oilfield wastes, and this utilization resulted in the contamination of their properties. . . . According to the plaintiffs' allegations, other contamination to their properties was caused by the "leaks, spills, and other discharges from oil wells, pipelines, tank batteries, plants and other equipment owned or operated by" defendants. The plaintiffs alleged that although the defendants knew or should have known that their day-to-day operations would lead to contamination, they refused to remove the pollution and toxic wastes caused by their endeavors and chose, instead, to hide it. This, the plaintiffs alleged, allowed the pollution and toxic waste to migrate and spread to the soils, surface waters, and groundwater of their properties. Based on the above stated facts, the

---

[1] The named defendants are Chevron U.S.A. Inc., successor in interest to Gulf Oil Company and Texaco, Inc.; Exxon Mobil Corporation, successor in interest to Exxon Corporation, Humble Oil & Refining Company, and Superior Oil Company; Radke Oil Company, Inc.; Great Southern Oil & Gas Company, Inc.; EOG Resources, Inc.; BP Corporation North America Inc., successor in interest to Yount Lee Oil and Amoco Production Company; Shell Oil Company; Kerr–McGee Oil and Gas Corporation, successor in interest to Sun Exploration–Production; Apache Corporation; Source Petroleum, Inc.; L & L Oil and Gas Services, Inc.; and Denovo Oil & Gas, Inc.

plaintiffs sought monetary damages based on theories of negligence, trespass, strict liability, strict liability for ultra-hazardous activity, and breach of contract and obligations as lessee.

The early procedural aspects of this litigation involved consideration of numerous exceptions filed in response to the plaintiffs' petition and resulted in the plaintiffs' pleadings being amended extensively.[2][3]

*Andrepont v. Chevron USA, Inc.*, 12-1100, pp. 1-2 (La.App. 3 Cir. 4/3/13), 113 So.3d 421, 423.

Chevron is the sole remaining Defendant. According to Plaintiffs, Chevron is the successor in interest to Gulf Refining Company of Louisiana, Gulf Oil Company, the Producers Oil Company, the Texaco Company, and Texaco.

Plaintiffs claim that the alleged contamination on their properties is associated with two earthen tanks or pits located in Section 42, Township 9 South, Range 2 West, in Acadia Parish ("Section 42"), which are referred to as The Wilkins Company Tanks No. 1 and No. 2 ("the Wilkins Tanks"), and that these tanks were connected by a flowline to oil and gas operations some distance away in the Jennings Field that transported produced oil and/or saltwater to the tanks. Plaintiffs assert that Chevron's corporate predecessors (collectively, "Gulf") utilized the flowline and the Wilkins Tanks for storage of oil and/or saltwater.

On October 15, 2020, Chevron filed a Motion for Summary Judgment seeking dismissal of Plaintiffs' claims against it. Chevron argued that the report and opinion testimony of Plaintiffs' expert, William C. Kimbrell, P.E., P.G., C.P.G. ("Mr. Kimbrell") was factually unsupported and speculative, and that Plaintiffs had no evidence to show that Chevron and/or its corporate predecessors operated on

---

[2] These amendments included the addition of other parties to the litigation.

[3] Plaintiffs also amended their petition to limit their claims to negligence, trespass, strict liability, and unjust enrichment.

their property or that their oil and gas operations elsewhere in the Jennings Field had any connection to or impact on their property.

Chevron also submitted the affidavit of Calvin Barnhill, P.E. ("Mr. Barnhill"), in support of its motion for summary judgment, but later, upon consent of the parties, substituted it with a similar affidavit by Richard Kennedy, P.E. ("Mr. Kennedy"), who is Mr. Barnhill's colleague, as Mr. Barnhill was not available for deposition due to illness. Mr. Kennedy's affidavit pointed out a lack of factual support for the opinions formed by Mr. Kimbrell.

The trial court granted Chevron's motion and dismissed Plaintiffs' claims against it. It concluded that Mr. Kimbrell's expert report and testimony was insufficient summary judgment evidence, as his opinions improperly depended on assumptions, suppositions, and extrapolations without sufficient supporting facts.

Plaintiffs appeal and assert the following assignments of error:

1. The District Court's admission of the transcript of the deposition of Richard Kennedy, P.E. filed in connection with Chevron U.S.A. Inc.'s Supplemental Reply Memorandum in Support of Motion for Summary Judgment was in contravention of the plain language of La.[Code Civ.P.][a]rt. 966(B)(3) prohibiting the filing of additional documents with the reply memorandum.

2. The granting of summary judgment is contrary to the law because Chevron did not meet its burden of demonstrating that no genuine issue of material fact existed.

3. Plaintiffs identified genuine issues of material fact related to whether Chevron, through the acts and omissions of its predecessors in interest, caused the damages to their properties which precluded the District Court's grant of summary judgment.

4. The District Court erred in failing to find that there were genuine issues of material fact based on the reasonable inferences drawn from William C. Kimbrell, P.E., P.G., C.P.G.'s expert testimony and affidavit; in assessing the persuasiveness of his expert opinions on summary judgment; and in granting summary judgment when his expert opinion evidence was admissible and sufficient to allow

the trier of fact to conclude that a material fact was more likely than not true.

# ANALYSIS

## Summary Judgment Standard of Review:

As stated by the supreme court in *Schultz v. Guoth*, 10-343, pp. 5-7 (La. 1/19/11), 57 So.3d 1002, 1005-06 (alteration in original):

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. *Samaha v. Rau*, 07-1726, pp. 3-4 (La. 2/26/08), 977 So.2d 880, 882-83; *Duncan v. U.S.A.A. Ins. Co.*, 06–363, p. 3 (La. 11/29/06), 950 So.2d 544, 546, *see* La.Code Civ. Proc. art. 966. "A summary judgment is reviewed on appeal de novo, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; i.e. whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law." *Samaha v. Rau*, 07-1726, pp. 3-4, 977 So.2d at 882-83.

A motion for summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ. Proc. art. 966(B). This article provides that "the summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. . . . The procedure is favored and shall be construed to accomplish these ends." La.Code Civ. Proc. art. 966(A)(2). La.Code Civ. Proc. art. 966(C)(2) sets forth the burden of proof in summary judgment proceedings, providing:

The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

This provision initially places the burden of producing evidence at the hearing on the motion for summary judgment on the mover, who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case. *Samaha v. Rau*, 07-1726, p. 4, 977 So.2d at 883. "At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial.... Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion." *Id.* (quoting *Wright v. Louisiana Power & Light*, 06-1181, p. 16 (La.3/9/07), 951 So.2d 1058, 1069-70).

**<u>Mr. Kennedy's Deposition:</u>**

Chevron initially submitted the affidavit of its expert, Mr. Barnhill, in support of its Motion for Summary Judgment. However, the parties subsequently agreed to allow Chevron to substitute Mr. Barnhill's affidavit with that of Mr. Kennedy, due to Mr. Barnhill's illness and unavailability for deposition. Plaintiffs' counsel subsequently deposed Mr. Kennedy.

Therefore, Chevron submitted an Amended Motion for Summary Judgment with Mr. Kennedy's affidavit attached. In response, Plaintiffs submitted an opposition to the amended motion and, in support thereof, attached excerpts from Mr. Kennedy's deposition. Chevron then submitted a reply memorandum wherein it sought the admission of Mr. Kennedy's entire deposition. At the summary judgment hearing, the trial court admitted Mr. Kennedy's deposition into evidence over Plaintiffs' objection.

Plaintiffs argue on appeal that Chevron should not have been permitted to submit Mr. Kennedy's deposition with its reply brief in accordance with La.Code Civ.P. art. 966(B)(3), which states:

B. Unless extended by the court and agreed to by all of the parties, a motion for summary judgment shall be filed, opposed, or replied to in accordance with the following provisions:

. . . .

(3) Any reply memorandum shall be filed and served in accordance with Article 1313 not less than five days prior to the hearing on the motion. No additional documents may be filed with the reply memorandum.

In response, Chevron argues that it did not submit Mr. Kennedy's full deposition transcript as an additional document filed with its reply memorandum, and it did not rely on Mr. Kennedy's deposition in connection with its motion for summary judgment. Rather, Chevron argues that, in accordance with La.Code Civ.P. art. 1450, it moved the trial court to require the submission of Mr. Kennedy's entire deposition because the excerpts relied upon by Plaintiffs did not accurately reflect Mr. Kennedy's opinions.

Louisiana Code of Civil Procedure article 1450 governs the use of depositions. It states in pertinent part, "[i]f only part of a deposition is offered in evidence by a party, an adverse party may require him to introduce any other part which, in fairness, should be considered with the part introduced, and any party may introduce any other parts." La.Code Civ.P. art. 1450(A)(4). This applies to depositions submitted in connection with motions for summary judgment. *Hypolite v. Scott Partners MLT, Inc.*, 19-704 (La.App. 3 Cir. 4/1/20), 297 So.3d 868.

Because Chevron sought the admission of Mr. Kennedy's entire deposition following Plaintiffs' initial submission of only excerpts from that deposition, we find no error in the trial court's acceptance of the entire deposition into evidence.

6

**On the merits:**

Plaintiffs' remaining assignments of error involve whether the evidence presented created material issues of fact on the issue of causation.

Plaintiffs argue that there is evidence in the record establishing that the Wilkins Tanks were transferred to Gulf in 1908, that those tanks were connected to a flowline that transported oil and saltwater from wells in the Jennings Field to the tanks, and that the flowline and tanks were more likely than not utilized by Gulf. Therefore, according to Plaintiffs, issues of material fact preclude summary judgment dismissal of their claims. In support of their arguments, Plaintiffs primarily rely on the conveyance records in evidence, as well as the report and deposition testimony of their expert, Mr. Kimbrell.

The conveyance records in evidence indicate that the Wilkins Tanks were constructed in Section 42 sometime between November 26, 1904, and September 30, 1905. The Wilkins Tanks had a total storage capacity between 240,000 and 250,000 barrels.

Specifically, on November 26, 1904, Elihu Coffin granted a surface lease to A.C. Wilkins and his partners for ten acres of land in the northwest quarter of Section 42. The written lease states that the lessees were "to have the right to use of the ground, for a period of two (2) years from this date," and were also "to have the privilege of laying pipe lines, from the north line of said quarter section, to the ten acres hereinabove described." The lease further granted the lessees "the right to construct on said ten acres, earthen tankage, for the purpose of storing petroleum oil therein[,] . . . [and] the right to connect pipes with their tankage and to lay all suitable pipes over and under said ground for the purpose of flowing oil to the said tankage[.]" The 1904 lease also states:

[i]f at the end of the said two years, the parties of the second part [the lessees] desire to continue to use the land for the purposes herein named, they to [sic] pay the first party [the lessor], a rental of $25.00 per acre per year for such additional time as they, parties of the second part, may use said land.

On September 30, 1905, one of the Wilkins partners, A. R. Knott, sold his interest in the 1904 lease to another partner, W. H. Stenger, including his interest in the Wilkins Tanks; however, Mr. Knott reserved a one-sixth interest in the oil that was stored in the tanks.

On November 16, 1905, a year after the original lease was granted, the Wilkins partners sold their interest in the 1904 lease to the Wilkins Company. This transfer specifically included the two Wilkins Tanks, as well as 240,000 barrels of fuel oil contained in the tanks.

In February 1906, the Wilkins Company sold its rights in the "North half (N/2) of ten (10) acres of land in the Northwest quarter (NW/4) of Section Forty-two (42)" to the Jennings Heywood Oil Syndicate ("the Syndicate"), "together with the earthen oil tank located on said premises known as 'The Wilkins Company Tank No.1[;]'" however, the Wilkins Company reserved "*all oil, pipe, pumps and other apparatus on said premises, except the runway from gauger, together with the right to remove same.*" (emphasis added). The Syndicate further agreed to "fulfil and carry out all the terms and conditions . . . expressed in that certain lease dated November 28, 1904, . . . in so far as they pertain to or may effect [sic] the portion of said ten acres herein leased."

On August 20, 1906, the Wilkins Company sold to G. B. Zigler & Company ("Zigler"), its rights, *inter alia,* in the south half of the ten acres of land in the Northwest quarter of Section 42, "including the earthen storage oil tank . . . known as The Wilkins' Company Tank No. 2, the interest of the Wilkins' Company in

8

said tract being acquired by lease from Elihu J. Coffin to A.C. Wilkins, A.R. Knott, and R.H. Stenger dated November 29th 1904[.]" Zigler further noted therein that it agreed to accept the terms and conditions of the respective leases and agreements at issue in the sale.

On October 31, 1907, Zigler sold various assets to the Syndicate, including "all the right, title, interest and claim . . . in and to the south half (S. ½) of ten (10) acres of land in the North west quarter (N.W. ¼) of section Forty two . . . more particularly described in the deed or contract dated Aug. 20th, A.D. 1906" between the Wilkins Company and Zigler.

On June 18, 1908, the Syndicate sold various assets in the Jennings Field to Gulf Refining Company, as set forth in a detailed, forty-six-page Indenture of lease and sale (the "Indenture"). The Indenture included an enumerated list of specifically described earthen tanks with an aggregate capacity of 3,350,000 barrels.

While the 1908 Indenture does not specifically mention the Wilkins Tanks, the 1904 surface lease, or the land covered by the 1904 surface lease, Plaintiffs argue that interests in the Wilkins Tanks were nonetheless transferred to Gulf pursuant to a phrase in the Indenture that transfers "each and every right, title, and interest of said Syndicate by it now owned . . . in and to, all and singular the lands and premises above described[.]"

In addition to the conveyance records, Plaintiffs rely on an October 30, 2019 report from their expert, Mr. Kimbrell. Mr. Kimbrell provided the following opinions in his report:

1) Numerous pits were constructed in Jennings Field, Louisiana, in the early 1900's, to contain the massive amounts of fluid production that exceeded available tanked storage.

2) Two of these pits were constructed on the Andrepont [Plaintiffs'] property.

3) More likely than not, the source of the contamination in the two pits on Andrepont's [Plaintiffs'] property identified by ICON was Gulf Refining Company and its successors.[4]

Mr. Kimbrell's report explains that in reaching these opinions, he first identified a flowline on an "old" aerial map of the Jennings Field dated approximately 1904 ("the 1904 map"). Mr. Kimbrell obtained this 1904 map from a prior affidavit prepared in 2012 by another one of Plaintiffs' experts, Greg Miller ("Mr. Miller"), and his company ICON Environmental Services, Inc. ("ICON"). Mr. Kimbrell stated in his report that this 1904 map

> depicts what appears to be a flowline running from just north of the southeast corner of Section 46 southwest past a large steel tank in Section 46 and passing through the northeast corner of Section 42. From there, the flowline turns due west and empties into pits labeled J.H.O.S (Jennings Heywood Oil Syndicate) before continuing west to empty into the two pits located on the Andrepont [Plaintiffs'] property.

Mr. Kimbrell's report further explains that he then identified a "USGS Bulletin" from 1910 that discussed the history of the Jennings Oil Field, showed pits and well locations from 1904, 1907, and 1908, and listed the well names and operators at the time. Mr. Kimbrell's report states that:

> [t]hough these maps do not extend far enough west to show the two [Wilkins] pits in question, when cross-referenced with the old [1904] field map . . . from ICON's report, the pit locations displayed in the bulletin maps match up exactly with the pits seen in ICON's . . . field map.

---

[4] During his deposition, Mr. Kimbrell stated that this was a typographical error, and he had amended his initial opinion to include both predecessors and successors of Gulf Refining Company of Louisiana. It appears that by "predecessors," he was referring not just to Gulf's corporate predecessors, but also to companies who had operated in the field prior to Gulf and whose assets were later transferred or sold to Gulf, such as Jennings-Heywood Oil Syndicate and the Wilkins Company. However, Plaintiffs do not otherwise suggest that Chevron and/or Gulf is liable in tort as a successor to Jennings-Heywood Oil Syndicate or the Wilkins Company, therefore, we do not address that issue herein.

According to Mr. Kimbrell's report, he then "began identifying the operators of wells in the area of the northeast extent of the previously described flowline from ICON's [1904 map]" and, "[o]f these wells in the northeast area, the majority were operated by Gulf Refining Company." Mr. Kimbrell then opined, "it is more likely than not that they [the Wilkins Tanks] were utilized by Gulf Refining Company since they [Gulf] would have had the most wells in the area at that time and the most fluid production and, therefore, in need of excess storage."

Plaintiffs also note on appeal Mr. Kimbrell's deposition testimony wherein he suggested that the flowline connected to the Wilkins Tanks shown on the 1904 map appeared to originate "about in the same area" as well numbers 258 and 259, which are located in Section 46 in the area northeast of the Wilkins Tanks, and which are referenced as "Gulf Refining (Wilkins)" wells. Plaintiffs further point to the following deposition testimony of Chevron's expert, Mr. Kennedy, which they argue supports a reasonable assumption that the Gulf/Wilkins wells were connected by the flowline to the Wilkins Tanks on Plaintiffs' property, and, therefore, the tanks were later utilized by Gulf in 1908 or later:

> Q. Okay, so we can all agree that at least as of 1905[5] there was a flowline that led to the pits on the plaintiffs' property; is that right?
>
> A. Correct.
>
> Q. Do you know what wells were connected to that flowline at any given time?
>
> A. . . . I have actually no information, no evidence to show exactly which wells were connected to that flowline.
>
> Q. Okay. . . when we talked about who operated the pits earlier, do you remember you had to help me out with a little chronology at some point?

---

[5] According to Mr. Kennedy, the "old map" attached to Mr. Miller's report was created in 1905, rather than 1904.

A.     Yes.

Q.     Okay. So you mentioned the Wilkins and/or the Wilkins Group, right?

A.     Correct.

Q.     Okay.  Did . . . any of their wells, the Wilkins individuals or the Wilkins Group, connect to the pits on the plaintiffs' property?

A.     I think that's a reasonable assumption to make.

Plaintiffs also note that there are no documents or other evidence in the record expressly indicating that the Wilkins Tanks were closed or that the flowline was removed prior to the 1908 Indenture to Gulf, and, therefore, they argue that there is sufficient evidence from which a factfinder could infer that Gulf utilized the flowline shown on the 1904 map to transport oil and/or saltwater to the Wilkins Tanks on Plaintiffs' property.

In addition, Plaintiffs take issue with the opinions stated in Mr. Kennedy's affidavit, which was submitted in support of Chevron's Motion for Summary judgment.  Mr. Kennedy's affidavit states the following opinions:

- There is not factual data sufficient to show that Gulf Refining Company ever utilized the flowline depicted in the historical map relied on by Plaintiffs' consultants; and

- There is not factual data sufficient to show that Gulf Refining Company ever stored fluids in the tanks (pits) on Plaintiffs' Property.

Mr. Kennedy stated in his affidavit that in forming his opinions, he reviewed Mr. Kimbrell's report and deposition, Mr. Miller's previous affidavits, the pleadings filed in this case, documentation provided in discovery, resources pertaining to the historical operations in the Jennings Field available in the archives of several Louisiana universities, reports and publications by the United States Geological Survey and other academic publications and trade journals

12

related to Jennings Field, the Louisiana Geological Survey, and materials on file with Louisiana Department of Natural Resources pertaining to the Jennings Field.

Mr. Kennedy further stated in his affidavit that while Mr. Kimbrell's opinion "relies on an overlay of the 'old field map' onto a recent aerial photograph to show that the old field map 'matches up' with the aerial photograph of the tanks (pits) on the Plaintiffs' property[,]" "this overlaying of the map with the aerial photograph does not provide any evidence to show that Gulf Refining Company or any Chevron predecessor ever used the flowline depicted as connecting to the Wilkins Tanks on the historical map." Rather, the 1904 historical map at issue predates Gulf's operations in the Jennings Field, which began following the 1908 Indenture.

In addition, Mr. Kennedy stated in his affidavit that he had not seen any factual support indicating what wells were actually connected to the flowline depicted in the 1904 map or otherwise suggesting that Gulf ever transported fluids through the flowline. He stated that "[i]t is not enough that a well is 'in the area' of a flowline to support a conclusion that any particular well was connected to the flowline. Therefore, the proximity of wells to the flowline cannot show what operators used the flowline at any point."

Mr. Kennedy also stated that he had not seen any factual data indicating that Gulf ever stored any quantity of fluid in the Wilkins Tanks. Mr. Kennedy further noted that there were no facts to support Mr. Kimbrell's assumption that Gulf used the flowline, his reasoning that Gulf needed excess storage because it had the most fluid production in the area, or his conclusion that Gulf stored fluid in the Wilkins Tanks.

Rather, Mr. Kennedy pointed out that the conveyance records indicated that other parties had claimed an interest in the oil stored in the Wilkins Tanks,

13

including one instance in 1905 where up to 240,000 barrels of oil were stored in the tanks, but that there were no such title documents relating to Gulf or any Chevron predecessor.

Mr. Kennedy additionally pointed out that there was no factual support for a conclusion that Gulf was ever in need of excess storage in the field. Rather, in accordance with the 1908 Indenture, Gulf was granted an interest in nine other specifically described earthen tanks with a total storage volume of over three million barrels, and that "this was more storage than the amount of oil produced in the entire field on an annual basis from 1909 forward[,]" as indicated in the documentation Mr. Kennedy relied on in creating his affidavit.

Finally, Mr. Kennedy stated in his affidavit that he had not seen evidence establishing that Gulf ever acquired a right to use the Wilkins Tanks. He noted that, after reviewing the applicable conveyance records, he had not seen any mention of the 1904 lease and/or the Wilkins Tanks after the assignment from Zigler to the Syndicate, nor had he seen any document transferring or assigning the 1904 lease or the Wilkins Tanks to Gulf, or any Chevron predecessor.

Rather, Mr. Kennedy indicated that he had seen evidence that Gulf executed and recorded surface leases with landowners when it did use earthen tankage, including six tanks (the "Leckelt Tanks"), which were specifically identified in the 1908 Indenture from the Syndicate to Gulf, and "[t]hese surface leases show that Gulf Refining Company had a practice of entering into and recording leases for earthen tankage during the same time period." The Leckelt Tank leases are in evidence.

Mr. Kennedy also pointed out in his affidavit that a January 19, 1912 lease for the Leckelt Tanks included a diagram of the flowlines leading to those tanks,

and that "[n]otably, this diagram has a different flowline configuration than the historical map relied upon by Mr. Kimbrell and Mr. Miller."

Plaintiffs argue on appeal that Mr. Kennedy's opinions are impermissibly "speculative because he is merely stating that he has not seen certain specific documents[,] not that they do not exist." Plaintiffs further argue that Mr. Kennedy's opinions "ignore the factual inferences that can be reasonably drawn from the enormous amount of evidence regarding historical activities in the Jennings Field."

In response, Chevron argues on appeal that, as the moving party, it sufficiently pointed to a lack of factual support necessary to establish that Chevron or its predecessors ever had a well that was connected to a flowline that led to the Wilkins Tanks on the Plaintiffs' property and/or that Chevron or its predecessors ever utilized the Wilkins Tanks on Plaintiffs' property; therefore, Plaintiffs cannot establish the requisite causation necessary for its claims against Chevron.

In support of its motion, Chevron submitted primarily the same evidence on which Plaintiffs rely—namely, Mr. Kimbrell's report and deposition, and the applicable conveyance records—as well as Mr. Kennedy's affidavit that points out a lack of factual support for Mr. Kimbrell's opinions. Chevron correctly notes that while Mr. Kennedy stated that he had not seen any evidence in the record or otherwise supporting Mr. Kimbrell's opinions, rather than stating that no such evidence exists, it is not Chevron's burden to disprove causation. *See Rogers v. Hilltop Ret. & Rehab. Ctr.*, 13-867 (La.App. 3 Cir. 2/12/14), 153 So.3d 1053. Rather, as the party not bearing the burden of proof of trial, Chevron is only required to point out an absence of factual support for an element of Plaintiffs' claim. *See Id.*

Chevron also points out that even though Mr. Kennedy testified that it was reasonable to assume that Wilkins Company's wells were attached to the Wilkins Tanks, this testimony was limited to when the Wilkins Company was in the field and based upon there being 240,000 barrels of oil stored in the tanks in 1905. In addition, Mr. Kennedy testified that it would *not* be reasonable to assume that wells once utilized by the Wilkins Company were still connected to the Wilkins Tanks when Gulf entered the field in 1908 because

> we don't see any ownership of the lease of those pits; and the only thing that . . . is there is the fact that it's on the . . . 1904 map. We don't know what happened after 1904 or 1905. There's just no information to show that – that Gulf used . . . those pits at all.
>
> . . . .
>
> . . . . [W]hen you look at one of the documents from Wilkins to [the Syndicate], they [Wilkins] reserved flowline . . . I think it says line . . . but with some of the other equipment there. It's basically the flowline to that pit. They reserved . . . that line and did not transfer that over to [the Syndicate].
>
> So I guess [a] reasonable assumption would be that – that Wilkins at the time bought the – the pipeline itself as – as an asset, you know some kind of commodity that they could probably just use in a different part of the field or sell to somebody or do something with.
>
> And, you know, keep in mind during this time getting steel tubulars in 1905, 1906, 1907 was – was a difficult thing to do, that I don't know of any steel mills in the south at that time that made those tubulars. They would probably come from Pittsburg, Pennsylvania, so those would have been highly prized commodities that they likely just sold or used elsewhere.
>
> . . . .
>
> . . . [W]e don't see it [the flowline] on any later maps. The only map we see it on is the 1904 map and nothing on any other maps.
>
> . . . .
>
> Well, given the fact that there was a – you know, this is almost like a gold rush. Given the fact there were a lot of wells being drilled

16

during that time span, and – and a lot of changes in the field during that time, I don't think you can – can assume that the pipeline is still in place in 1908.

Chevron also argues that there is no evidence in the record indicating that the two-year surface lease granted in 1904 pertaining to the Wilkins Tanks was extended or otherwise in effect at the time of the 1908 Indenture to Gulf. In addition, Chevron notes that it would be unreasonable to assume that the Wilkins Tanks would have been silently, rather than expressly, transferred to Gulf, given the evidence indicating that Gulf had a practice of entering into and recording agreements for earthen tanks that it did use.

Chevron further argues that Mr. Kimbrell's expert report and opinions relied upon by Plaintiffs are impermissibly speculative to create genuine issues of fact necessary to defeat summary judgment.

Louisiana Code of Civil Procedure article 967(A) states as follows with respect to expert affidavits submitted in connection with motions for summary judgment: "The supporting and opposing affidavits of experts may set forth such experts' opinions on the facts as would be admissible in evidence under Louisiana Code of Evidence Article 702, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Louisiana Code of Evidence article 702 states:

A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;
(3) The testimony is the product of reliable principles and methods; and

17

(4) The expert has reliably applied the principles and methods to the facts of the case.

The Louisiana Supreme Court, in *Independent Fire Insurance Co. v. Sunbeam Corp.,* 99-2181, 99-2257, pp. 16-17 (La. 2/29/00), 755 So.2d 226, 235-36 (internal citations omitted), stated as follows with respect to the consideration of expert opinion testimony submitted in connection with motions for summary judgment:

> Thus, having determined that . . . the *Daubert–Foret* standards should be considered by the trial judge in deciding whether to admit expert opinion evidence, several important underlying principles must be reinforced. The first is that the trial judge cannot make credibility determinations on a motion for summary judgment. Second, the court must not attempt to evaluate the persuasiveness of competing scientific studies. In performing its gatekeeping analysis at the summary judgment stage, the court must "focus solely on the principles and methodology, not on the conclusions they generate." Third, the court "must draw those inferences from the undisputed facts which are most favorable to the party opposing the motion." Fourth, and most importantly, summary judgments deprive the litigants of the opportunity to present their evidence to a jury and should be granted only when the evidence presented at the motion for summary judgment establishes that there is no genuine issue of material fact in dispute. If a party submits expert opinion evidence in opposition to a motion for summary judgment that would be admissible under *Daubert–Foret* and the other applicable evidentiary rules, and is sufficient to allow a reasonable juror to conclude that the expert's opinion on a material fact more likely than not is true, the trial judge should deny the motion and let the issue be decided at trial.

In *Andrepont*, 113 So.3d 421, this court affirmed a summary judgment rendered against the same Plaintiffs herein and dismissed their claims against Defendant, Radke Oil Company, Inc. ("Radke"). In opposition to Radke's motion for summary judgment, Plaintiffs relied on the affidavit of Mr. Miller, with ICON Environmental Services, who opined that the contamination on Plaintiffs' properties had been caused by Radke's storage of oil and production wastes in tanks on Plaintiffs' property.

18

Mr. Kennedy discussed Mr. Miller's affidavit during his deposition, and Mr. Miller's affidavit is in evidence in connection with Chevron's instant motion for summary judgment. Mr. Miller stated in his affidavit that he had identified flowlines on historical maps that connected the two pits on Plaintiffs' properties to oil operations to the east. This included the 1904 map later utilized by Mr. Kimbrell. Mr. Miller's affidavit further reflects that he then "plotted the location of several of the Radke wells at issue . . . . [and] then determined that the flowlines appear to originate from wells operated by Radke, among others." Mr. Miller then opined that "these flowlines transported oil production with some quantity of produced salt water from the Radke wells to these pits for storage."

In affirming the summary judgment dismissal of Plaintiffs' claims against Radke, this court stated as follows with respect to Mr. Miller's affidavit:

> [Louisiana Code of Civil Procedure article] 966(C)(2) . . . simply requires the nonmovant to present evidence that if believed by the trier of fact, would allow he or she to prevail at a trial on the merits. . . . At best, Mr. Miller's affidavit establishes that the flow lines "appear" to originate from wells operated by Radke. This assertion, standing alone and if believed by the trier of fact, does not satisfy the plaintiffs' preponderance burden of proof. This is particularly true given the fact that it does not establish whether Radke was an operator of any of the wells at the time the oil and/or waste material was being transported through the flow lines or whether it assumed any responsibility for the actions of previous operators.

*Andrepont,* 113 So.3d at 428.

Mr. Kimbrell's report and deposition testimony indicate that he used the same maps and factual data, including the 1904 map depicting the flowline at issue, relied upon by Mr. Miller in forming his opinions, except that Mr. Kimbrell concluded that Gulf and/or its successors or predecessors, rather than Radke, more

likely than not used the flowline depicted in the 1904 map to transport oil or salt water to the earthen tanks or pits on Plaintiffs' property.

Mr. Kimbrell's report states that the same 1904 map that was attached to Mr. Miller's affidavit depicts "what appears to be a flowline" running from Section 46 to the Wilkins Tanks in Section 42, and that a majority of the wells "in the area of the northeast extent of the previously described flowline" on the 1904 map were operated by Gulf Refining Company. Mr. Kimbrell then concluded that Gulf more likely than not utilized the flowline since it had the most wells and fluid production "at that time" and was in need of excess storage.

During his deposition, Mr. Kimbrell elaborated on his opinion that Gulf and its successors more likely than not were the source of contamination in the two pits on Plaintiffs' property, stating: "I'm saying that Gulf was the majority user, but I'm not saying that they were . . . the only user." He further explained that his basis for finding that Gulf contributed to the majority of the fluid to the pipeline is that Gulf and its predecessors had "more wells around the vicinity of that flowline[.]"

Mr. Kimbrell also testified in his deposition that in preparing his report and opinions, he did not perform a public records search to determine who had used the Wilkins Tanks. He stated that, in creating his report, he did not know, or otherwise take into consideration that the 1904 lease states that the purpose of the tanks was for oil storage, that A. R. Knott had reserved an interest in the oil stored in the tanks in September 1905, or that there were 240,000 barrels of oil stored in the tanks as of November 16, 1905, which was near storage capacity. He further indicated that while he was aware that there was an assignment from the Syndicate to Gulf in 1908, he did not study the document, and he did not know whether the

20

Wilkins Tanks were specifically listed. Rather, he noted that the 1908 Indenture includes assignments of wells that are "in the proximity" of the flowline leading to the Wilkins Tanks on Plaintiffs' property.

Additionally, Mr. Kimbrell testified that he based his opinion that Gulf had the most fluid production in the area on the number of wells it had, but that he did not know how much each well produced over time. He also explained that his opinion that Gulf was in need of excess storage was based on the fact that it had storage tanks in the field. He indicated that, while he had no specific evidence, he knew from experience that Gulf would have produced a lot more saltwater as the field matured, and therefore it would have needed to have a place to store it. Thus, he reached the conclusion that Gulf utilized the Wilkins Tanks on Plaintiffs' property.

Like Miller's affidavit in *Andrepont,* 113 So.3d 421, we similarly conclude that Mr. Kimbrell's report and testimony, at best, establishes that a flowline depicted on a 1904 map appears to be in the vicinity of wells that Gulf did not operate until at least 1908, and that Gulf thereafter operated a majority of the wells in the vicinity of that depicted flowline. However, this is insufficient to establish that Gulf and/or its successors actually used the flowline to transport oil or saltwater to the Wilkins Tanks for storage, or otherwise satisfy Plaintiffs' preponderance of the evidence burden of proof.

While Mr. Kimbrell ultimately formed the opinion that Gulf more likely than not utilized the flowline depicted in the 1904 map to store fluids in the Wilkins Tanks, we agree with the trial court that Mr. Kimbrell "tried to morph" "tangential facts" into evidence that Gulf put oil or saltwater into the Wilkins Tanks and that his opinions "depend on a lot of assumptions, suppositions, [and]

21

extrapolations." Therefore, Mr. Kimbrell's opinions to this extent are insufficient summary judgment evidence, as they are not based upon sufficient facts or data, as required by La.Code Civ.P. art. 967(A), La.Code Evid. art. 702, and *Independent Fire Ins. Co.*, 755 So.2d 266.

Rather, as Mr. Kennedy pointed out in his affidavit, there is a lack of *factual* evidence in the record to support Plaintiffs' position that Gulf utilized the flowline depicted on the 1904 map and/or the Wilkins Tanks, and, despite Plaintiffs' argument to the contrary, we fail to see any factual evidence in the record upon which a factfinder could reasonably infer that Gulf utilized the Wilkins Tanks. Therefore, we affirm the trial court's summary judgment dismissal of Plaintiffs' claims against Chevron.

## DECREE

For the reasons stated above, the trial court's summary judgment dismissal of Plaintiffs' claims against Defendant Chevron USA, Inc. is hereby affirmed. Costs of this appeal are assessed to Plaintiffs.

**AFFIRMED.**